**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| VIMALA LLC, dba ALECIA<br>and<br>ALECIA VENKATARAMAN<br><br>       Plaintiffs<br><br>       v.<br><br>WELLS FARGO BANK, N.A.;<br>WELLS FARGO MERCHANT<br>SERVICES, LLC; and FIRST DATA<br>MERCHANT SERVICES, LLC<br><br>       Defendants. | No. _____<br><br>Judge _____<br><br>**JURY DEMAND** |

## VERIFIED COMPLAINT

COME NOW plaintiffs Vimala LLC., dba Alecia and Alecia Venkataraman and hereby file this complaint against defendants Wells Fargo Bank, N.A., Wells Fargo Merchant Services, LLC, and First Data Merchant Services, LLC, and state as follows:

## INTRODUCTION

1.      This is an action against Wells Fargo Bank, N.A. (sometimes "The Bank"), Wells Fargo Merchant Services, LLC (sometimes "WFMS"), and First Data Merchant Services, LLC (sometimes "First Data," together "Defendants") for fraud, violations of the Tennessee Consumer Protection Act, conversion, breach of contract, and other claims. Over a period of two years, Defendants knowingly, intentionally, and recklessly destroyed the business and reputation of plaintiffs Vimala LLC dba Alecia ("Vimala") and Alecia Venkataraman

Case 3:19-cv-00513   Document 1   Filed 06/19/19   Page 1 of 64 PageID #: 1

("Alecia," together "Plaintiffs") by stealing Plaintiffs' primary source of revenue, charging exorbitant fees, and gaslighting Plaintiffs to keep them quiet.

2.     In 2014 Alecia founded Vimala in her living room as a woman-and-minority-owned small business. Vimala is an e-commerce and technology startup that sells merchandise by creating shoppable videos. Customers can view the shoppable videos and, by using Vimala's proprietary technology, can purchase goods through Vimala's videos and /or visual media via credit card. Over the next four years, Alecia grew the startup into a successful business that employed 40 people and generated millions of dollars in revenue.

3.     In 2016 Defendants induced Plaintiffs to enter a relationship with them. Plaintiffs desperately needed a merchant services account in order to process all of Vimala's credit card transactions which made up all of Vimala's business. Defendants held WFMS out to Plaintiffs as the only merchant services provider able to help Vimala's high volume of transactions. Defendants entered into an agreement with Vimala, promising to process customers' payments, to hold Vimala's money from credit card purchases (hereinafter the "Funds"), and to release the Funds to Vimala. Defendants then convinced Plaintiffs to open multiple merchant services accounts operated by WFMS and First Data.

4.     Throughout the first ten months of 2017, Vimala processed thousands of customer transactions, totaling more than one million dollars in sales, through merchant accounts and gateways created by and managed by WFMS and First Data. Defendants had control over all of the Funds. However, since that time, Defendants have refused to turn over *any* of the Funds. Defendants have refused to communicate, investigate, and/or otherwise assist Vimala with obtaining the Funds and instead have repeatedly hidden and misrepresented the availability of the funds. Plaintiffs pleaded with Defendants that Vimala's

business depended completely on the release of the Funds. When Plaintiffs tried to end the relationship, Defendants threatened Vimala with more than one million dollars in fees and penalties if Plaintiffs left the relationship.

5.     **Defendants knowingly and intentionally kept Vimala's credit card revenues. Defendants refused to remit the Funds in breach of their own agreement. When Plaintiffs' questioned their actions, Defendants engaged in an astonishing scheme of corporate gaslighting designed to confuse, silence, and demoralize Plaintiffs so that Defendants could keep Plaintiffs and the Funds entrapped.** Defendants acted with full knowledge that stealing Vimala's funds and covering it up would smother Vimala's primary source of revenue, which it did, causing Vimala to shut down operations in October 2018.

6.     Defendants gravely damaged Vimala by knowingly choking off its revenue stream and directly causing Vimala's destruction. Defendants' shocking and tortious actions caused Vimala to lose at least $40,000,000 in business contracts, default on millions of dollars in debt, lay off its entire staff, and go out of business, as well as other damages.

7.     Defendants also severely harmed Alecia. Defendants immensely damaged her credit and reputation. Because Defendants destroyed Vimala, Alecia lost all of the value of her ownership in the company she founded, which was valued in 2018 at over $40,000,000. Alecia was also damaged emotionally by having to watch her company, that she had built from the ground up, be destroyed through the wanton and reckless actions of the Defendants.

8.     Plaintiffs now bring this action damages, the release of funds, and treble and punitive damages in a total amount of at least **Two Hundred Fifty-Five Million Nine Hundred Sixty-Eight Thousand Eight Hundred Thirty-Three Dollars and Eighty-Six Cents ($255,968,833.86)**.

## PARTIES

9.     Plaintiff Vimala LLC., dba Alecia, is a Tennessee limited liability company formed in 2014 whose primary place of business is, 1550 W. McEwen Drive, Suite 300, Franklin, TN 37067

10.     Plaintiff Alecia Venkataraman is a Tennessee resident.

11.     Defendant Wells Fargo Bank, N.A. is a California corporation with its primary place of business at 464 California St., San Francisco, CA 94104 and may be served at: Corporation Service Company Which Will Do Business in California as CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

12.     Defendant Wells Fargo Merchant Services, LLC is a Delaware limited liability company with its primary place of business at 1200 Montego Way, Walnut Creek, CA 94598, and may be served at: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

13.     Defendant First Data Merchant Services, LLC., is a Florida limited liability company with its primary place of business at 5565 Glenridge Connector, Ste 2000, Atlanta, GA 30342 and may be served at: Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds the $75,000.00 threshold and there is complete diversity of citizenship of the parties.

15.     Defendant Wells Fargo Bank, N.A. has submitted itself to the personal jurisdiction of this court by registering to conduct business in this state with the Tennessee

Secretary of State. Diversity jurisdiction is proper because the Bank is a Delaware corporation with its primary place of business in California.

16.     Defendant WFMS is not registered to conduct business in Tennessee. However, this Court still has personal jurisdiction over WFMS because it has engaged in a continuous and systematic course of doing business in Tennessee by offering and providing payment processing services to Tennessee citizens and companies. Furthermore, diversity jurisdiction is proper because WFMS is wholly owned by the Bank and First Data neither of which are citizens of, incorporated in, or have a primary place of business in the State of Tennessee.

a.    Defendant First Data has submitted itself to the personal jurisdiction of the court by registering to conduct business in this state with the Tennessee Secretary of State. Diversity jurisdiction is proper with this Defendant because First Data only has one member, who is not a citizen of the State of Tennessee. CESI Holdings, LLC is First Data's sole member and is a Delaware corporation with its primary place of business at 5565 Glenridge Connector, Atlanta, GA 30342 (Exhibit 1).

ii.   CESI Holdings, LLC is not registered with the Secretary of State of Tennessee.

iii.  CESI Holdings, LLC is a subsidiary of First Data Corporation.

1.  First Data Corporation is not registered with the Tennessee Secretary of State.

2.  First Data Corporation is a Delaware corporation (Exhibit 2) and its primary place of business is 5565 Glenridge Connector, Suite 2000, Atlanta, GA 30342.

17.    Venue lies within this judicial circuit pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred herein.  Due to the intangible nature of merchant services processing, money transfers, and the online banking industry, venue is proper where the Plaintiff's business is located and all of its banking and financial transactions were carried out.

18.    Jurisdiction and venue are proper for each claim asserted in this complaint.

## FACTS

### *How Merchant Services Work*

19.    Like many small businesses, Vimala's survival depends upon accepting credit and debit cards for payment of its goods and services. That, in turn, requires merchants (like Vimala) to establish and maintain a merchant services account to accept credit and debit cards as payment from customers (i.e. cardholders).

20.    Merchants are forced to rely on the companies that provide this crucial service to act with good faith and fair dealing and to timely remit customers' payments into the merchant's account.

21.    The credit card processing system is difficult to understand and has many moving parts and parties.  The modern-day credit card processing system is comprised of:

    a.    **The Card Issuer**: The card issuer (sometimes called the "issuing bank") is the company that issued the debit card or credit card to the customer. Citibank, JPMorgan Chase, and Capital One are examples of card issuers.

    b.    **The Card Network:** The card networks also known as card associations operate as a custodian and clearing house for their respective card brands.  They also act as governing body of a community of financial institutions. A card association's

primary responsibilities are to govern members of their association, to oversee

decisions made about fees, qualification guidelines, and to act as an arbiter

between the card issuer and acquiring banks.

c. **The Member Bank**: A member bank (sometimes referred to as the acquiring

bank or the merchant bank) is a registered member of one or more card

networks/card associations. Only large banks such as Defendant Wells Fargo

Bank, N.A. may be member banks. Member banks "sponsor" payment processors

so that the payment processors may process transactions through the card

networks. Defendant, First Data (as a payment processor) works with Defendant

Wells Fargo Bank, N.A. (as its member bank) in this capacity. Member banks

provide merchants with the necessary software or hardware to accept credit card

and debit card payments. Member banks provide customer service to merchants

and deposit funds from credit card sales into a merchant's account.

d. **The Payment Processor:** The payment processor is the entity that processes the

cardholders' payment through the card network and ensures that when a

cardholder pays for a good or service with a credit card or debit card, the

cardholder's account is debited, and the merchant's account is credited.

Defendant First Data, which co-owns Defendant WFMS with Defendant Wells

Fargo Bank, N.A. serves as payment processor for all of WFMS' merchants.

e. **The Merchant Acquirer:** A merchant acquirer markets the payment processor's

services to merchants. Merchant acquirers act as "middlemen" between

merchants and payment processors. They enroll merchants in payment processing

services and usually provide customer support to the merchant. Merchant

acquirers usually work with independent agents or companies who are then paid a processing fee. Defendant WFMS is a payment processor but also signs up merchants directly. Defendant Wells Fargo Bank, N.A. also works as a merchant acquirer through its extensive sales force.

### *Vimala, LLC d/b/a Alecia*

22.     In 2014, Alecia founded Vimala out of her home with nothing but a good idea. For the first two years Alecia was the sole employee and CEO of the company, and for the next two years Alecia toiled long hours to create and grow her brand.

23.     Vimala is a female minority owned e-commerce, technology, and creative content startup that creates shoppable videos that are marketed to customers who watch the videos online and make purchases directly from Vimala through links available as part of the viewing experience.

24.     In the fall of 2016 Vimala was using a merchant services provider that limited Vimala to $20,000.00 in transactions per month.

25.     In October 2016, Vimala launched its first ever campaign and exceeded the $20,000.00 per month limit within three days.

26.     Due to its success, Vimala was in dire need of a larger merchant services processing account. Most merchant service providers were unable to handle the Plaintiffs' needs. Alecia told Defendants that Vimala needed a merchant services processor that could handle a minimum of $60,000.00 per month.

27.     On multiple occasions throughout the fall of 2016, the Bank (through multiple relationship bankers and account managers) solicited WFMS' services to Alecia and persuaded her to open a merchant services account for Vimala through Defendants. (At this time, it was not

Page 8

made clear to Plaintiffs that WFMS, the Bank, and First Data were three separate entities because they were all marketed as the same merchant services product offered by the Bank).

28.     As they solicited Plaintiffs, Defendants represented and advertised to Plaintiffs that they could handle Plaintiffs' volume of transactions with a single merchant services account. The Bank leveraged the fact that Plaintiffs already had established accounts and a relationship with the Bank in efforts to induce Plaintiffs to open a merchant services processing account with WFMS using First Data for processing of transactions.

29.     On or about December 7, 2016, Alecia visited a branch of the Bank, located at 210 South Royal Oaks Boulevard, Franklin, TN 37064, in person. There, having been persuaded by Defendants, Alecia agreed to set up a WFMS account for Vimala. While at the branch, an unknown employee of the Bank took Vimala's information and told Alecia they would have someone contact her to set up a WFMS account.

30.     On or about December 9, 2016, a male identifying himself as Mike Telathourp ("Telathourp") contacted Alecia by phone in order to open a merchant services account for Vimala. At all times Telathourp held himself out as an employee and/or representative of "Wells Fargo," and Alecia believed she was speaking to an authorized representative of WFMS, First Data, and the Bank. The application to open a merchant services account (***********9102) was completed over the phone with the assistance and at the direction of Telathourp.

31.     On or about December 11, 2016, Plaintiffs received a welcome letter via U.S. mail from the Bank and WFMS signed by Telathourp thanking Vimala and Alecia for their business and welcoming them to Wells Fargo Merchant Services (Exhibit 3).

32.     Alecia expressed concern to the Bank that the daily processing limits Defendants placed on Vimala's merchant service account were too low to accommodate Plaintiffs' rapidly

growing business. Defendants through their agents and employees, including Defendant

Telathourp, assured Alecia that WFMS' services would be sufficient, and Defendants could open

"multiple" merchant accounts for Vimala as a way to *get around* Defendants' monthly volume

limits by underwriting each account separately as a way to increase processing limitations.

33.     In late December 2016, Plaintiffs were induced by Defendants to open an

additional merchant services account (************1222).  This account was opened in late

December but did not become active until early January 2017 at which time Plaintiff was

induced to open a third merchant services account (************1622).

### *Terms of the Contract*

34.     As part of its merchant services agreement, WFMS has a 63-page Program Guide

with over 130 subsections where most of the contractual terms and explanation of the merchant

services process are disclosed.  Merchants are then required to sign a "Confirmation Page" to

suggest they have read and understood the Program Guide, despite the fact that that it is an

adhesion contract drafted in favor of the Defendants.

35.     Vimala entered into a contract for WFMS to provide merchant services and

processing services with First Data acting as payment processor. The Merchant Services

Agreement (hereinafter "Agreement") consisted of the Confirmation Page which was executed

and returned by Alecia to Defendants (Exhibit 4); the Merchant Services Program Guide which

includes the Confirmation Page along with listed responsibilities of each party; and a separate

section for definitions that (purport to) define and explain the relevant terms in the Agreement.

See Agreement as Exhibit 5, the terms of which are included by reference to this paragraph as if

fully set forth herein.

36.     At all relevant times incident to this complaint, Vimala complied with the terms and responsibilities of the Agreement. At no time was Vimala in breach of the Agreement.

37.     The Agreement itself summarizes the relevant terms and they are as follows:

    a.  For Plaintiffs:

        i.  Ensure compliance with cardholder data security and storage requirements.

        ii.  Maintain fraud and chargebacks below Card Organization thresholds.

        iii.  Review and understand the terms of the Merchant Agreement.

        iv.  Comply with Card Organization Rules and applicable law and regulations.

        v.  Retain a signed copy of the Confirmation Page.

    b.  For Defendants:

        i.  The Bank is the only entity approved to extend acceptance of Card Organization products directly to a merchant.

        ii.  The Bank must be a principal (signer) to the Agreement.

        iii.  The Bank is responsible for educating merchants on pertinent Visa and MasterCard Rules with which merchants must comply; but this information may be provided to the merchant by Processor.

        iv.  The Bank is responsible for and must provide settlement Funds to the merchant.

        The Bank is responsible for all Funds held in reserve that are derived from settlement. (See Exhibit (5) - Wells Fargo Merchant Services Guide, Part 1, Page 5)

38.     The Agreement provided that the absolute longest that WFMS was allowed to retain a hold on the account was for ten (10) months, and only under specific circumstances. (See Exhibit (5) - Wells Fargo Merchant Services Agreement, page 12 section 11.2)

39.     Despite their initial representation to Plaintiffs that one merchant services account would be sufficient, Defendants (each of whom appeared to be the same entity to Plaintiffs) over the course of the next two months, insisted to Plaintiffs that two additional accounts were necessary in order to circumvent their own policies dealing with monthly transaction limits in the event the volume of business was too great.  When Alecia pressed the Defendants as to why three accounts were necessary as opposed to one account that could handle the growing business, Defendants explained that multiple accounts were a way to avoid red flags and prevent unnecessary holds on funds.

40.     Vimala began processing sales through the WFMS accounts (account numbers: ************9102 and ************1222) in late December of 2016 and January of 2017. Over the course of their relationship, tens of thousands of Vimala's transactions were processed by WFMS. (See paragraph 41)

41.     Composite Exhibit 6 is a list illustrating the volume of transactions being transacted by Vimala through its video campaigns, through Vimala's website e-commerce platform, and through the payment processor. Each transaction may be traced from the consumer purchasing the good to Vimala's WFMS accounts.

42.     At the direction of the Defendants, Vimala, set up a new separate account with $62,000.00 in reserve in the event of chargebacks.  The new account was funded by Defendants holding Plaintiffs' cash from sales. Defendants led Plaintiffs to believe that a separately funded chargeback account would prevent holds on Plaintiffs' Funds.

43.    In early January 2017, Vimala was using a checking account ending in 5335 with the Bank to be used solely to receive payments from Vimala's WFMS account. At this point Vimala had eight total accounts (three merchant services and five bank/money market) with the Bank, and Alecia was the only authorized signer on each account.

44.    After a few days of transactions, through WFMS, Alecia and Vimala noticed that no money was being transferred out of the WFMS merchant services accounts into the bank account ending in 5335.  Alecia was personally told, over the phone by an unknown employee of the Bank that this was due to the high risk of the account and all Funds were on a hold.

45.    On or about January 9, 2017, Alecia called WFMS at 800-451-5817, the same number that she had previously used and would subsequently use, and spoke with an unknown "support" person who told Alecia that Vimala's account was under review for an unknown reason (Exhibit 7).

46.    On or about January 12, 2017, Alecia called the Bank back and spoke to a person named Patricia who informed Alecia that her account was still under review and that Vimala's issue had been escalated to Bank management.

47.    On or about January 17, 2017, Alecia once again called WFMS support and spoke with a manager whose name is unknown. This manager told Alecia that Vimala's account details could not be located and that the issue was likely caused by a "system error."

48.    On or about January 18, 2017, Alecia once again called Bank support and was told that her account was under review and that it had been volume flagged for exceeding the dollar amount limit on Vimala's account.  The Bank recommended opening a third additional merchant services account.

49.     Alecia began calling the Bank and/or WFMS every day to follow up on Vimala's Funds.  Alecia did her best to impress upon anyone who would listen to her at the Bank that unless the Funds were released, she was going to be put out of business.  At this point Alecia was told over the phone by an unknown employee of the Bank that Vimala's Funds were under a 120-day hold.

50.     In the spring of  2017 Vimala attempted to cancel the Agreement, but a representative of Defendants threatened that Vimala would be liable to Defendants for very high termination fees calculated as $500.00 plus six times the highest amount of revenue in any single calendar month (Exhibit 5, page 55, section 41.3), which would have been in excess of one million dollars.  Unable to afford the potential fees, Vimala was forced to keep the account open.

51.     After the purported 120 day hold period expired, in spring 2017, Alecia was told by an unknown employee of the Bank that the Funds were subject to a 180-day hold.  That same employee of the Bank told Alecia that a 180-day hold was unusual.

52.     During the period in which the Funds were not being released, Vimala was processing customer orders through WFMS and First Data in an amount as high as more than $200,000 per month.

53.     At no point did Defendants alert Vimala that its customers payments did not go through, that the customer transactions had not been successful, or that the customers never paid money in to the WFMS accounts though First Data.  At no point was Vimala made aware of an unusual number of chargebacks or any other factors indicative of fraudulent activity. To the contrary, upon investigation Plaintiffs determined that virtually all transactions were successful, and the Funds made their way into the hands of First Data and into Defendants' accounts.

54.     Upon information and belief, all of the Funds collected from Vimala's customers during this same period are being held by one or a combination of Defendants or are otherwise within the control of Defendants or otherwise have been lost or given to an unauthorized party by Defendants.

### *Transaction Statements and WFMS Records*

55.     At all times incident to this complaint, Defendants failed to provide adequate information, reporting, and/or accounting of Funds, settlements, and fees.

56.     At all times, Defendants prevented Vimala and Alecia from obtaining full details about the accounts and transactions.  Defendants granted Plaintiffs only limited access to information and did not provide online access to any of the accounts. Throughout the time period that Vimala processed payments through WFMS and First Data, Plaintiffs made multiple requests to be given online access to the accounts, but those requests were denied each time. At all times relevant, the only way for Vimala to check on over a million dollars' worth of customer transactions in real time was to make telephone calls to Defendants' often nameless and randomly assigned customer service representatives and to take their word for it.

57.     Even Defendants' mailed paper statements were designed to prevent Plaintiffs from knowing full information about the Funds. On or about January 31, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed during the then relevant time period as $100,627.57. (Exhibit 8). The January 2017 statement for account ************9102 did not include transaction level details of the amounts processed.

58.     On or about February 28, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" for account number:

************9102 which showed the total amount of money processed as $78,794.94. (Exhibit 9). Again, the February 2017 statement for account ************9102 did not include transaction level details of the amounts processed.

59.     On or about February 28, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" for account number: ************1222 which showed the total amount of money processed as $83,316.85. (Exhibit 10). The February 2017 statement for account ************1222 did not include transaction level details of the amounts processed.

60.     On or about March 31, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $137,775.76. (Exhibit 11). Like the January and February 2017 statements for account ************9102, the March 2017 for that account omitted transaction level details of the amounts processed.

61.     On or about March 31, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" account number: ************1222 which showed the total amount of money processed as $97,400.74. (Exhibit 12). Like the February 2017 statement for account ************1222, the March statement for that account omitted transaction level details of the amounts processed.

62.     On or about April 30, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $64,151.48. (Exhibit 13). Yet again, the April 2017 statement for account ************9102 did not include transaction level details of the amounts processed.

63.     On or about April 30, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" account number: ************1222 which showed the total amount of money processed as $90,059.92. (Exhibit 14). Like the statements before it, the April 2017 statement for account ************1222 omitted all transaction level details of the amounts processed.

64.     On or about May 31, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $101,308.37. (Exhibit 15). The May 2017 statement for account ************9102 omitted transaction level details for the amounts processed.

65.     On or about May 31, 2017 Alecia received a one-page document, via U.S. Mail, from the Bank labeled "Your Card Processing Statement" account number: ************ 1222 which showed the total amount of money processed as $84,185.03. (Exhibit 16). The May 2017 statement for account ************1222 also omitted transaction level details for the amounts processed.

66.     On or about June 30, 2017 Alecia received, via U.S. Mail, a one-page document from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $82,663.57. (Exhibit 17). The June 2017 statement for account ************9102 did not include any transaction level details for the amounts processed.

67.     On or about June 30, 2017 Alecia received, via U.S. Mail, a one-page document from the Bank labeled "Your Card Processing Statement" account number: ************1222 which showed the total amount of money processed as $76,277.99. (Exhibit 18). The June 2017

statement for account ************1222 did not include any transaction level details for the amounts processed.

68.     On or about July 28, 2017 Alecia received, via U.S. Mail, a one-page document from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $67,157.50. (Exhibit 19). The July 2017 statement for account ************9102 did not include any transaction level details for the amounts processed.

69.     On or about August 31, 2017 Alecia received, via U.S. Mail, a one-page document from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $87,561.92. (Exhibit 20). The August 2017 statement for account ************9102 did not include any transaction level details for the amounts processed.

70.     On or about September 30, 2017 Alecia received, via U.S. Mail, a one-page document from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $63,949.34. (Exhibit 21). The September 2017 statement for account ************9102 did not include any transaction level details for the amounts processed.

71.     On or about October 31, 2017 Alecia received, via United States Post, a one-page document from the Bank labeled "Your Card Processing Statement" for account number: ************9102 which showed the total amount of money processed as $18,713.63. (Exhibit 22). Like all the statements before, the Bank omitted all transaction level details from the October 2017 statement for account ************9102.

72.     There is a third Merchant Services account, that upon information and belief holds more than $107,813.22of the Funds.  Alecia and/or Vimala never received a statement for the third account.

73.     The information regarding the account activity was very limited but it did roughly correlate with Vimala's customer transaction activity (although Plaintiffs dispute the accuracy of the numbers in the statements). Plaintiffs relied on these statements as evidence that Defendants were holding the Funds and the Reserve Deposit pursuant to Defendants' obligations under the Agreement.

74.     Vimala was not provided with any itemized transactions, fees, chargebacks, or other deductions that may have been taken out of the accounts.

75.     Upon information and belief, the amounts of Funds transacted through Defendants accounts exceeds the amounts reported to Plaintiffs.

***Efforts to Release Funds***

76.     On or about June 5, 2017 Alecia called WFMS support and repeated her requests for statements and online access to Vimala's accounts.  An unknown support employee informed Alecia that Vimala's accounts had phone support only.

77.     On or about June 12, 2017 Alecia called WFMS support and spoke with an unknown support employee and for the third time asked to close Vimala's merchant services account.  This unknown employee informed Alecia that fees for cancelling were estimated to be over One Hundred Thousand Dollars. Vimala could not afford such a high termination fee and had no choice but to continue to leave the account open.

78.     On or about June 15, 2017 Alecia called WFMS account support and asked to speak with Defendant, Telathourp.  Alecia was informed that Telathourp was unavailable.

79. On or about July 10, 2017 a WFMS employee informed Alecia that access to Vimala's account was denied and that the issue had been escalated.

80. On or about July 21, 2017 a WFMS employee informed Alecia that access to Vimala's account was still denied and the issue was still being escalated.

81. In July of 2017 WFMS and/or Bank provided Plaintiffs with a verbal list of issues that were contributing to the unreasonably long hold on her Funds. The reasons that WFMS gave as allegedly contributing to the non-release of Funds included:

   a. To be such a new company with such high sales was considered risky.

   b. Vimala was a seller of products but did not control its own inventory. Consumers would purchase items from Vimala, and the item would be shipped directly from manufacturer.

   c. Ironically, WFMS was concerned about Vimala's lack of liquidity while WFMS and the Bank were holding millions of dollars of liquid assets hostage.

82. Defendants led Plaintiffs to believe that if Plaintiffs resolved the aforementioned issues contributing to the hold on the Funds then the Funds would be released. Despite having already made the Reserve Deposit account in the spring of 2017, in August 2017 Plaintiffs decided to address each of these concerns.

83. Vimala addressed Defendants' liquidity concern by bringing in an investor who contributed $1,125,000 of liquid capital in exchange for a seven and a half percent (7.5%) stake in the company. Next, Vimala leased a warehouse (Exhibit 23) in order to stock and control their own inventory and oversee all aspects of the buying, selling, and shipping merchandise. As for the significant sales volume, Plaintiffs went so far as to close campaigns and cut off sales at

$100,000.  Alecia sabotaged her company and her dream by limiting her own success to appease Defendants.

84.    On or about August 8, 2017 Alecia went to a Bank branch in person to discuss Vimala's accounts and its ongoing issues.  Alecia was told by an unknown Bank employee that they were unable to locate the details of Vimala's account.

85.    On or about August 30, 2017 Alecia called WFMS support and spoke with an unknown support employee and requested a review of Vimala's account. The unknown employee was unable to complete a review and notified Alicia that the matter was being escalated.

86.    None of the changes Defendants requested had any effect. The Funds were still not released.

87.    After the 180-day hold expired, and after Plaintiffs had made the Reserve Deposit account and addressed the Defendants' liquidity and inventory control concerns, Defendants still continued to withhold the Funds from Vimala. Alecia continued going to local branches of the Bank in an effort to find answers, and on each occasion, she demanded to speak with someone until she was helped.

88.    On or about October 24, 2017 Alecia called WFMS account support and spoke with an unknown employee.  Alecia provided notice to this unknown employee that Vimala was ending processing with WFMS.

89.    On or about November 8, 2017 Alecia contacted WFMS support via telephone and demanded that fifty percent (50%) of Vimala's Funds be released.  That demand was ignored.

90.     In November 2017 Vimala stopped processing orders through WFMS, removed Defendants' merchant services from its website, and sent a notice of termination via certified U.S. Mail (Exhibit 25).

91.     On or about December 1, 2017 Alecia contacted WFMS support via telephone to follow up with Vimala's account termination only to be told by an unknown support employee that the accounts were still open.

92.     On or about December 19, 2017 Alecia sent demand letters to two separate addresses for WFMS (as found in the Agreement) demanding that Vimala's Funds be released. Once again, the demand for release of Funds was ignored by Defendants.

93.     On or about December 28, 2017 Alecia contacted WFMS support via telephone to confirm Vimala's accounts had been closed but WFMS was unable to provide any information at all about the release of the held Funds.

94.     In December 2017 Alecia received a letter from WFMS stating that her account had been closed due to inactivity and termination fees would be charged to the account. Alecia never received a final statement to know what fees were charged or the final balance of any accounts. There was no mention in the letter about the Reserve Deposit account.

95.     A third letter was sent on or about January 25, 2018 demanding that Vimala's Funds be released.

96.     On or about January 10, 2018 Plaintiffs requested a payout schedule from Defendants.

97.     Throughout this time Alecia continued to call and visit branches of the Bank in an effort to have the Funds released.

98.     On or about February 15, 2018 Alecia called Wells Fargo Support at 800-451-5817 and requested that her case be further escalated and requested a payout schedule.

99.     On or about February 27, 2018 Alecia spoke via phone call with a Support Manager named Carl. Carl was still unable to provide online access to Vimala's accounts.

100.    On or about March 6, 2018 an additional demand letter was sent to Defendants demanding the immediate release of the Funds.

101.    On or about March 21, 2018 Alecia once again called Wells Fargo Support at 800-451-5817 and was told by an unknown employee that her case had been escalated but that WFMS could hold Vimala's Funds for up to *ten additional months*. The Bank provided no reasoning or justification for the potential length of hold.

102.    On or about April 13, 2018 Alecia called WFMS support and an unknown employee told Alecia that Vimala's case had been escalated and payout by the end of 2018 was likely.

103.    On or about April 17, 2018 a fifth demand letter was sent to WFMS demanding an immediate release of the Funds.

104.    On or about April 28, 2018 a WFMS support employee told Alecia that they were unable to access Vimala's account.

105.    On or about May 10, 2018 Alecia, once again, spoke with an unknown WFMS support employee, via telephone, who once again told Alecia that Vimala's matter had been escalated but that they were unable to access Vimala's account due to the account being closed.

106.    On or about May 20, 2018 Alecia went to a Bank branch in person where she met with a representative of the Bank named Anjali Tiwari to discuss Vimala's account. Ms. Tiwari

informed Alecia that she would do some research because she was unable to access WFMS system.

107. On or about May 22, 2018 Anjali Tiwari told Alecia via email that according to the last statement, her account balance was $801,603.24 and the review team was processing documentation from third parties to close transactions for 2017. Ms. Tiwari stated that once that process was completed the Funds would be released on the following schedule:

   a. June $22,000.10
   b. July $33,911.00
   c. August $129,017.00
   d. September $167,622.01
   e. October $139,117.00
   f. November $113,723.13
   g. December $196,213.00

(Exhibit 26). The email went on to say that Alecia would receive the full release of her Funds by the close of 2018. *Id.*

108. On or about May 30, 2018, Alecia once again called WFMS support and spoke with an unknown employee, at which time Alecia confirmed her Bank account information by providing requested documents in order to establish Alecia's identity.

109. On or about June 29, 2018, Alecia once again called WFMS account support and spoke with an unknown employee. This unknown employee told Alecia that there was no information available on the payout of Vimala's Funds because the details were blocked. However, this unknown employee was unable to explain what "blocked" meant.

110. In June 2018 Alecia was verbally told by another Bank representative (whose identity is unknown at this time) that $22,000.00 had been released from account ************1222. However, Vimala never received a check or a statement, and the money was not reflected in any of Vimala's other accounts. Upon information and belief, Defendants lost, improperly transferred, or stole this money.

111.    On or about October 26, 2018, a representative of The Bank named Liz Harrington told Alecia, via email, that she was able to verify that the account was still scheduled for settlement in Q4 of 2018. (Exhibit 27) Upon information and belief, this representation was not true, and Defendants had no intention to settle the account.

112.    The fourth quarter of 2018 came and went, and to this day no Funds have been released. Defendants have never explained what happened to Vimala's Reserve Deposit account.

113.    The Defendants now deny that the accounts ever existed. This can only mean one of two things: either Defendants lied about the Funds being in the accounts in the first place or the Defendants are lying about the accounts never having existed.

114.    In January of 2019, Alecia went to the Bank branch at 5415 Maryland Way, Brentwood, TN 37027 and spoke with Jennifer Rigney and Robert Wilcox (Exhibit 24), who escalated the issue to the WFMS Executive Office.

115.    On or about January 28, 2019, Alecia began having a conversation with an employee of WFMS named Sharon S. (Exhibit 28).  Allegedly, Sharon S. conducted an investigation into the missing Funds.

116.    Sharon requested some documentation from Vimala in the form of:

    c.    A complete copy of the WFMS contract;

    d.    Complete merchant statements, and;

    e.    A copy of the 2017 IRS Form 1099 that WFMS allegedly provided.

117.    At all times the complete and executed copy of the contract, the complete merchant statements, and the 2017 IRS Form 1099 were under the sole control of Defendants and at no time were these documents ever provided to Plaintiffs.

118.     These documents were never provided by Defendants to Alecia and/or Vimala, therefore, Plaintiffs could not provide the requested information to Sharon S.

119.     Because Alecia did not have these documents to provide, Sharon S. abruptly ended the investigation with no apparent conclusion or resolution and ceased communication with Plaintiffs.

120.     Since Sharon S. closed her investigation, Defendants have refused to provide further information or release the Funds or the Reserve Deposit account to Plaintiffs.

## DAMAGES

121.     Defendants have engaged in a systematic scheme and practice of corporate gaslighting by 1) taking Plaintiffs' Funds, 2) convincing Plaintiffs that Vimala's business was the problem by causing the delay in settlement, 3) lying, misrepresenting, and concealing the status of the Funds, 4) inducing Plaintiffs to take actions that Defendants' promised would solve the delay, 5) promising settlement of the Funds when they knew the Funds were not forthcoming, and finally, 6) denying that the Funds ever existed. Plaintiffs have suffered and continue to suffer significant damages caused by Plaintiffs' ongoing fraudulent actions, conversion, breach of contract, and negligence.

122.     Defendants have converted at least $1,695,944.62 (the Funds) from Vimala's merchant services account. Defendants have additionally converted $62,000.00 in Vimala's money (the Reserve Deposit), as well.

123.     Defendants, through their continued refusal to settle Vimala's accounts have effectively destroyed Vimala, LLC.  Without the lifeblood of liquid capital, Vimala has been rendered sterile and unable to complete existing contracts or enter into new contracts. It has had to lay off a staff of 40 employees.

124.     The contracts that Vimala was forced to breach by Defendants' actions were valued in excess of $40,000,000.00. In order to obtain those contracts guaranteeing exclusivity rights, Vimala contracted to pay the owners of those rights in excess of $1,620,067.00 across five separate contracts (Exhibits 29, 30, 31, and 32). Vimala was then forced to pay $10,434.75 when it found itself in breach of the most lucrative contract (Exhibit 33). Vimala would have been able to perform its obligations and reap the benefits under these contracts solely but for Defendants' actions. The measure of these damages is ascertainable and calculable.

125.     Vimala leased a warehouse to address Defendants' concern about Vimala not being responsible for its own inventory (*See* Exhibit 23). Defendants continued to hold the Funds hostage rendering Vimala unable to timely pay its rent thereby accruing late fees in the amount of $9,869.70 (Exhibit 34) on the warehouse rent along with a $40,943.28 fee upon termination of the lease (Exhibit 35). Plaintiffs still owe the brokerage firm a $50,000.00 fee for the initial lease. Defendants' actions caused Vimala to enter said lease, break said lease, and incur damages relative thereto.

126.     Because Defendants were holding the liquid capital that Vimala so desperately needed, Vimala did not have sufficient cash on hand to pay its taxes and therefore accrued penalties and interest in excess of $25,000.00 along with a notice of intent to seize Vimala's property (Exhibit 36).

127.     As A guarantor on Vimala's indebtedness, Alecia's credit has been damaged, Alecia has endured severe emotional distress, and her goodwill and reputation in the business community has been injured. Due to Defendants' fraud, it is now it is now nearly impossible for Alecia, a startup entrepreneur, to obtain capital to sustain Vimala or other business ventures. These are compensable damages for which Defendants are liable.

128.     Prior to the tortious actions of the Defendants, Alecia was the sole owner of Vimala. Due to the tortious actions of the Defendants, Alecia was forced to bring in new investors, in addition to personally guaranteeing significant loans in order to meet Defendants' demand that Vimala have increased liquidity.  In exchange for the investment, Alecia gave up 7.5% of Vimala. Alecia never intended to dilute her ownership in Vimala but she was put in a position by the Defendants where she could either retain full ownership of Vimala and watch all of her hard work disappear, or she could give up some control in an effort to keep Vimala open until the Defendants remitted full payment to the Plaintiffs.

129.     The value of the dilution of Alecia's membership interest is at least $1,125,000.00. Defendants are liable for the damages caused by Alecia's dilution of ownership of Vimala.

130.     Additionally, Defendants' actions in injuring Vimala have greatly diminished its value to Alecia as the 92.5% owner of Vimala. In 2018, immediately prior to Defendants' driving Vimala out of business, Vimala was valued at an amount of at least $40,000,000. The value of Alecia's ownership is at least $38,125,000.00. Directly and proximately due to Defendants' actions, in October 2018 Vimala was abruptly forced to halt operations. Since that time Vimala has not recovered. Today, bogged down in defaulted loans, Vimala has a value of virtually zero. Defendants are liable to Plaintiffs for the aforementioned diminution in value.

131.     Furthermore, Vimala's primary lender's notes were collateralized against the Funds being held by the Defendants. Additionally, the company's expansion and contracts were centered around the release schedule provided by the Defendants. The fourth quarter of 2018 through the second quarter of 2019's cash flow plan was built upon reliance of those Funds being available. Moreover, investors, lenders, major entertainment companies, vendors and customers

made decisions, investments and signed contracts relying upon that cash flow plan built around Defendants' promises.

## APPARENT AGENCY

132.    Plaintiff realleges every allegation set forth in paragraphs 1 through 131 and incorporates those allegations by reference.

133.    Defendants First Data and WFMS' businesses are so inextricably linked to Defendant Bank, it was and is impossible for Plaintiffs to differentiate between the three Defendants.  It appeared, and still appears, to Plaintiffs that all three were simply The Bank.

134.    Plaintiffs, on multiple occasions, were able to conduct business relating to the WFMS account, in person, within a brick and mortar branch of The Bank.

135.    Communication regarding Vimala's merchant services account came from representatives of WFMS from The Bank's email addresses, with The Bank's logo, and on The Bank's letterhead.  WFMS and First Data were using The Bank's name, logo, email addresses, and information with full support of The Bank (*See* Exhibits 3, 5, 8-22, 24, 26, 27, 28, and 39).

136.    In the Agreement, WFMS expressly refers to itself as the "Bank" (*See* Exhibit 5).

137.    Vimala relied on apparent authority of WFMS and First Data to its detriment by believing the products and services that were being offered were products of The Bank and if there was a problem, The Bank would act on Vimala's behalf to resolve the issue.  Instead, Defendants' joint acts and omissions cost Vimala tens of millions of dollars.

138.    The Bank, WFMS, and First Data actually or negligently consented to each of the other Defendants exercise of authority. The Plaintiffs, Alecia and Vimala, had knowledge of the facts and a good faith belief that the Defendants' apparent agent possessed such authority and was acting on behalf of Defendants collectively or as a single entity. Plaintiffs relied on this

apparent authority to their detriment (*Boren ex rel. Boren v. Weeks*, 251 S.W.3d 426, 432 (Tenn. 2008)).

## COUNT ONE

## FRAUDULENT CONCEALMENT

139.   Plaintiffs reallege every allegation set forth in paragraphs 1 through 138 and incorporates those allegations by reference.

140.   From January 2017 to the present, Defendants, jointly and through their agents, have fraudulently concealed the status, location, and amount of the Funds and Reserve Deposit account in Vimala's merchant services and bank accounts. Defendants have repeatedly and continuously engaged in a scheme to prevent Plaintiffs from learning that Vimala's Funds and Reserve Deposit account were no longer available and had been taken, converted, destroyed, or lost by one or more of the Defendants. Defendants engaged in this scheme by insidiously cooperating to feed Plaintiffs wildly different and inconsistent stories regarding the Funds and Reserve Deposit account, by actively hiding the actual status of the Funds, and by promising that the Funds and the Reserve Deposit account would be released to Plaintiffs' accounts when no such intent existed. Meanwhile, unbeknownst to Plaintiffs, Defendants knew and were aware of the true facts and conditions of the Funds and Reserve Deposit Accounts, their whereabouts, transactions, fees, and the settlement status of the accounts, and repeatedly and continuously hid the true condition of the accounts to Plaintiffs.

141.   Defendants had a duty to disclose known facts or conditions to Plaintiffs regarding the Funds:

   a.   Defendants formed a special relationship with Plaintiffs where Plaintiffs expressly reposed a trust and confidence in Defendants and/or where the Agreement,

transactions, and relationship was intrinsically fiduciary and called for perfect good faith.

    b.   Even in the absence of a special relationship, Defendants had a duty to disclose material facts affecting the essence of the Agreement's subject matter, especially in light of Defendants' omissions and misrepresentations toward Plaintiffs.

    c.   Additionally, Defendants had a duty to disclose basic, material information that they knew, Plaintiffs would act upon and that Plaintiffs were without knowledge of the information and were without reasonable means of acquiring the information itself.

142.    Defendants repeatedly and continuous omitted and concealed the true facts and condition of Vimala's Funds and the Reserve Deposit account and the status of the accounts from Plaintiffs. Among multiple other instances which are detailed herein, or which will be learned in discovery, Defendants made the following specific omissions and fraudulent concealments:

    a.   On multiple occasions, Defendants repeatedly failed to provide Vimala with complete and accurate account statements and transactions records for each of Vimala's accounts. Plaintiffs were forced to rely solely on the paper statements because Defendants prevented Plaintiffs from any other means of accessing the accounts, Yet, these paper statements were designed and intended to prevent Plaintiffs from knowing the full and true condition of the accounts and Funds. In the case of the third account, Defendants never provided any paper account statements at all.

b. In January 2017 employees of Defendants stated to Plaintiffs that Funds had not been released for various and conflicting reasons, including that all Funds were "under review" and "on hold" due to, alternatively "the high risk of the account" and "unknown reasons."

c. On or about January 17, 2017 a Bank manager stated that Vimala's account details could not be located due to a "system error."

d. On multiple occasions, including on June 5, 2017, WFMS support denied Plaintiffs' online access to information about Vimala's accounts, even after multiple demands from Alecia.

e. On more than one occasion in July 2017, a WFMS employees stated that access to Vimala's account was denied and that the issue was being escalated.

f. On or about August 8, 2017 an unknown Bank employee stated that The Bank was unable to locate the details of Vimala's account.

g. On or about April 13, 2018 an unknown employee of WFMS stated that Vimala's case had been escalated and payout by the end of 2018 was likely.

h. On or about May 10, 2018 an unknown WFMS support employee, via telephone, stated that WFMS was unable to access Vimala's account due to the account being closed.

i. On May 22, 2018 Bank agent Anjali Tiwari, represented to Plaintiffs that the account balance was $801,603.24 and the review team was processing documentation from third parties to close transactions for 2017. Ms. Tiwari stated that once that process was completed the Funds would be released on the following schedule:

     a.  June $22,000.10
     b.  July $33,911.00
     c.  August $129,017.00
     d.  September $167,622.01
     e.  October $139,117.00
     f.  November $113,723.13
     g.  December $196,213.00

And that the balance of Vimala's Funds would be released by the end of 2018 (*See* exhibit 26). These statements were false, and Plaintiffs never received the Funds.

j.  On or about June 29, 2018, Defendants, through an employee whose name is unknown, stated that there was no information available on the payout of Vimala's Funds because the details were "blocked." This is evidence that Defendants were specifically and actively intending to block information from Plaintiffs and deliberately concealing the facts of the Funds.

k.  In June 2018 a Bank representative stated that $22,000.00 had been released from account number: ************1222. This was untrue and no money ever was found.

l.  On or about October 26, 2018, a representative of Bank named Liz Harrington reaffirmed that Funds would be released Q4 of 2018. (*See* exhibit 27). This was not true, and no Funds were ever settled.

m.  In or about January 2019, bank representatives began to deny that the merchant services accounts ever existed.

n.  In January 2019, an employee of WFMS named Sharon S. purported to conduct an investigation into Vimala's missing Funds. Sharon S. demanded multiple documents that Plaintiffs had never received from Defendants, and then abruptly

cut off communications, failing to disclose known facts and conditions of the accounts.

    o.    Since the end of January 2019, Defendants have refused to communicate with Plaintiffs, conduct any investigation, or share any information with Plaintiffs regarding the existence, status, and amount of the Funds

143.    Defendants repeatedly and continuously made these conflicting, false statements to Plaintiffs deliberately intending to obfuscate the facts and confuse, placate, silence, browbeat, and demoralize Plaintiffs. Moreover, Defendants intentionally and repeatedly blocked Plaintiffs' access to the accounts, specifically and explicitly refusing access, information, explanation, and, at the end, any communication whatsoever.

144.    Plaintiffs reasonably relied on the resulting misrepresentations. Indeed, Plaintiffs had absolutely no choice but to rely on the assurances that holds were the fault of Vimala, or that the Funds would be distributed according to schedule, or that the lack of information was due to system error. Defendants were in such a level of trust and confidence with Plaintiffs that Plaintiffs believed and relied on the repeated statements, as surely "Wells Fargo" was exercising perfect good faith and taking care of Vimala's money.

145.    Defendants failed to disclose basic, material information regarding the Funds even though it knew that Plaintiffs were running their entire business off of this stream of revenue and were acting to buy inventory, conduct sales, and grow the business based on the knowledge that Funds would be transferred into and available in the merchant services accounts. Since Plaintiffs had virtually no access to any accurate information regarding the Funds—much less any inside access to Defendants' internal records—Plaintiffs were without reasonable means to acquire the information itself.

146. Plaintiffs suffered damages as a result of fraudulent concealment. Specifically, and particularly, Plaintiffs suffered the following serious injuries:

    a. Vimala has failed to receive at least $1,633,944.62 from Defendants that belongs to Vimala.

    b. Vimala paid $62,000.00 into a reserve deposit that Defendants hold to this day and that belongs to Vimala.

    c. Vimala has been virtually shuttered directly due to Defendants failing to pay Vimala the Funds, which represent nearly all of Vimala's revenue during the periods relevant to this action. Vimala has been forced to terminate more than forty (40) employees, defaulted or surrendered multiple leases, lost hundreds of thousands of dollars in inventory that it lacked the Funds to sell, incurred penalties and interest for unpaid taxes, and defaulted on more than $5,500,000.00 in indebtedness.

    d. Defendants fraudulent actions directly and proximately cause Vimala to lose, breach, or fail to deliver on multiple contracts with sales partners, as set forth in paragraph 107 and incorporated herein by reference, for a total lost value of more than Forty Million Dollars ($40,000,000). These contracts were entered into in reliance of Defendants' actions and omissions.

    e. As a guarantor on Vimala's indebtedness, Alecia has suffered damage to her credit score, to her goodwill, and to her reputation. Due to Defendants' fraud, it is now it is now nearly impossible for Alecia, a startup entrepreneur, to obtain capital to sustain Vimala or other business ventures.

Case 3:19-cv-00513   Document 1   Filed 06/19/19   Page 35 of 64 PageID #: 35

      f.   Alecia has suffered the dilution of her ownership in Vimala due to her having to

sell membership interest in Vimala to raise capital as a direct result of

Defendants' actions in an amount of 7.5% of the total membership interest in

Vimala.

      g.   As a direct result of Defendants' fraudulent misrepresentations and omissions,

Alecia has had her membership interest in Vimala, valued at over $38,125,000.00

destroyed to virtually nothing.

147.    Defendants committed the fraudulent omissions and concealment by use of the

US Mail and via the wires.

148.    Defendants are liable for fraudulent concealment against Plaintiffs.

## COUNT TWO

## FRAUD IN THE INDUCEMENT

149.    Plaintiffs reallege every allegation set forth in paragraphs 1 through 148 and

incorporates those allegations by reference.

150.    Defendants fraudulently induced Vimala to enter into a merchant services

relationship by making false statements about the nature of the relationship. Defendants then

fraudulently induced Vimala to remain in that relationship by making false statements about the

status of the Funds subject to the Agreement and by making false threats regarding the fees and

penalties if Vimala attempted to end the relationship.

151.    Defendants induced Vimala to enter into the Agreement by fraudulent means.

Defendants, jointly and through their agents, made false statements concerning facts material to

the transaction. Specifically and particularly, Defendants made the following false statements:

a.  In early December 2016, Defendants, through Telathourp, induced and sold Vimala the Agreement through communications with "Mike Telathourp." Telathourp's name is false and was used specifically to induce Plaintiffs to do business with Defendants.

b.  In December 2016, Defendants made multiple statements in order to induce Plaintiffs to enter the Agreement that WFMS was a good fit for Vimala's needs, that a single WFMS' merchant services account could handle the volume of transactions Vimala requested, and made statements in the Agreement regarding Defendants' responsibilities and promises to pay Vimala Funds from customer transactions and repay Funds held in reserve (Agreement, part 1, p. 5, paras. iv and v). Upon information and belief, these statements were false at the time made and Defendants never intended to process Vimala's volume of transactions and pay the Funds to Vimala.

c.  In December 2016 and in the winter and spring of 2017, Defendants represented to Plaintiffs that in order to do business through WFMS at a high volume of transactions, Defendants needed to open multiple accounts in Plaintiffs' names to process customer transactions. When Alecia questioned the reason for the multiple accounts, Defendants refused or could not answer her but instead insisted it was correct and induced her into the Agreement. Upon information and belief and upon evidence, this policy is false, and the representation was used as a means to obtain commissions and credit for opening multiple accounts and/or to otherwise hide and obfuscate Plaintiffs' Funds.

Page 37

d. In or about spring 2017 Defendants represented to Plaintiffs that, even though Defendants were in breach of the Agreement and failed to pay out the Funds are required under the Agreement, Plaintiffs would have to pay exorbitant fees and penalties in an amount of over One Million Dollars ($1,000,000). These fees were false and not true when the statements were made, or else were illegal and Defendants knew they could not collect these fees. Additionally, the fees and penalties statements are false because when Plaintiffs did terminate the Agreement, no fees or penalties were ever assessed.

152. Defendants, through their agents, had knowledge of the falsity of the statements made above or else Defendants had utter disregard for the truth of those statements.

a. Specifically and particularly, Defendants never had any intention of honoring their statements and Defendants knew that the statements made were false. Defendants knew that WFMS product sold to Defendants could not handle the number of customer transactions, and from the beginning never intended to release the Funds. As evidence in support of this allegation, *inter alia*, within a few days of the accounts being set up Defendants informed Alecia that the Funds were unavailable for, alternatively, unknown reasons, various holds, and, on January 17, 2017 "system errors." In other words, from the *very beginning*, Defendants gave Plaintiffs the runaround regarding the availability of Funds, showing that Defendants knew, had to know, or utterly disregarded the fact that Vimala's accounts were not going to be paid to Vimala.

b.   Additionally, as evidenced from Defendants' *not* charging and fees and penalties upon termination, Defendants never intended to actually charge Plaintiffs the fees but used the threats as a way to keep Plaintiffs from terminating the Agreement.

153.    Defendants intended to induce Plaintiffs' reliance on the false statements with the specific purpose of inducing Vimala to entering into the Agreement and to open the multiple accounts. Defendants further intended to induce Plaintiffs to remain with WFMS by making Plaintiffs rely on the threat of fees and penalties if they terminated the Agreement.

154.    Plaintiffs relied on the false statements under circumstances manifesting a reasonable right to rely on the statements. Specifically and particularly, Plaintiffs reasonably relied on the statements because they believed that WFMS was in a position of trust as one of the largest merchant service providers to provide services as requests, that Mike Telathourp was a real person as he communicated to Plaintiffs on real Wels Fargo letterhead, that the multiple accounts were necessary because they were told this by trusted bankers from the Defendants in a bank setting, and that the fees and penalties were legitimate and equitable and would be owed if Vimala attempted to terminate.

155.    Plaintiffs were injured as a direct result of their reliance on Defendants false statements. Specifically, Plaintiffs were injured in a manner and to an extent as set forth in para. 125 above which is incorporated fully into this paragraph by reference as if set forth fully herein.

156.    Defendants committed fraud in the inducement by use of the US Mail and via the wires.

157.    Defendants are liable for fraud in the inducement of a contract.

## COUNT THREE

## COMMON LAW FRAUD

158.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 157 and incorporates those allegations by reference.

159.     From January 2017-January 2019 Defendants jointly engaged in a scheme and pattern to intentionally, knowingly, recklessly, and without regard to the truth, separate Plaintiffs from more than $1,633,944.62 and prevent them from access to these Funds. Defendants carried out this scheme by multiple agents of the Defendants, including Telathourp making repeated misrepresentations about the status, amounts, and payout of Vimala's Funds over a two-year period while removing, transferring, destroying, or losing the Funds in question and benefitting off of the Funds themselves.

160.     Defendants, jointly and through their agents, made one or more representations of an existing or past fact(s) or otherwise failed to disclose or omitted material facts. Specifically and particularly, Defendants made the following representations and material omissions:

   a.   In December 2016 and for a period of many months after, Defendant Telathourp held himself out to be a legitimate employee of one of Defendants and an apparent agent of each of the other Defendants and represented that his real name was Mike Telathourp. In fact, Telathourp is not his real name nor the real name of any real person and was an alias used by Telathourp and adopted by and endorsed by Defendants. By way of example, On or about June 15, 2017, Alecia called WFMS account support and asked to speak with Defendant, Telathourp.  Alecia was informed that Telathourp was unavailable. In other instances, in the spring of 2017, Alecia called WFMS customer support and asked for Telathourp, and

customer support acknowledged the request and Defendant Telathourp returned the call.

b. In January 2017 multiple employees of Defendants represented to Plaintiffs that Funds had not been released for various and conflicting reasons, including that all accounts were "under review" and "on hold" due to alternatively "the high risk of the account" and "unknown reasons." Upon information and belief, these Funds were available. Defendants representatives knew the statements were false when made.

c. On or about January 17, 2017 a Bank manager stated that Vimala's account details could not be located due to a "system error." This representation was false when made since the accounts could not be both under review and not located.

d. On or about January 18, 2017 Defendants represented that Vimala's account was under review and that it had been volume flagged for exceeding the dollar amount limit on Vimala's account. The Bank recommended opening an additional account as a way for Vimala to ensure it received its Funds. The representations were false when made.

e. In spring 2017 an unknown employee of the Bank represented that the Funds were subject to a 180-day hold. Upon evidence, this representation was false when made. The Funds were not actually under any legitimate hold but had been converted, destroyed, or lost and Defendants did not want Plaintiffs to know this.

f. Defendants provided multiple partial statements to Plaintiffs regarding the bank accounts via mail, as set forth fully in paragraphs 39-53 of this complaint and incorporated herein by reference. These statements were representations made by

Defendants regarding the value, fees, and status of the Funds. The representations were untrue and do not accurately reflect the correct amount of the Funds in the accounts and were false when made.

g. On repeated and numerous occasions Defendants through customer service represented that the matter had been "escalated." Upon evidence, Defendants never really escalated the matter but merely stated this as a tacit and/or implicit policy to placate and stall Plaintiffs.

h. Defendants induced Vimala to deposit $62,000.00 (the Reserve Deposit) with Defendants under the promise that the Reserve Deposit account would afford Vimala quicker access to the Funds.  Defendants knew that the Reserve Deposit would not offer the remedy as promised, converted the Reserve Deposit to their own use, and still hold the Reserve Deposit to this day despite Plaintiff's demands that it be returned.

i. In July 2017 Defendants represented that the "hold" on Vimala's Funds was as a result of Plaintiffs' own pattern of activity, including lack of liquidity and not holding inventory. The representation that these were actual reasons for the hold were false and known to be false by Defendants but made anyway in order to stall Plaintiffs and throw them off the true trail: that the Funds were never going to be available. As further evidence of the ludicrous level falsity when made, Defendants accused Vimala of illiquidity when it had processed and held more than One Million Dollars in Vimala's own liquid Funds.

j. On or about December 1, 2017 WFMS support made representations via telephone that the accounts were still open. This directly contradicted multiple other statements by Defendants that the Funds were closed and unavailable.

k. On or about June 29, 2018 Defendants, through an employee whose name is unknown, represented that there was no information available on the payout of Vimala's Funds because the details were "blocked." This representation was false when made since multiple times immediately before and after agents of Defendants claimed to have access to the accounts. The misrepresentation was made with the intent of preventing Vimala from receiving its Funds.

l. In June 2018 a Bank representative stated that $22,000.00 had been released from account number: ************1222. This was untrue and no money ever was found in any account belonging to Plaintiffs.

m. The Defendants now deny that the accounts ever existed. This can only mean one of two things: either Defendants lied about the Funds being in the accounts in the first place or the Defendants are lying about the accounts never having existed.

161. Defendants' representations were false when made and the true facts were known when the omissions were made.

162. Defendants' representations and omissions were in regard to a material fact.

a. Particularly, the representations and omissions made were regarding the existence, status, and payout of Vimala's Funds.

b. Additionally, the representations made by Telathourp as to his alias were material because it created a level of trust between Plaintiffs and Defendants through Telathourp, and through his actions on behalf of Defendants Plaintiffs entered into

the Agreement with Defendants. Telathourp's use of an alias obscured his true identity and allowed Plaintiffs to interface with persons selling them products under false identities. Further, Telathourp's use of an alias was in furtherance of Defendants' overall scheme to sell merchant services to Plaintiffs, open multiple accounts, convert Vimala's Funds, prohibit Vimala from terminating the Agreement without paying exorbitant and unspecified fees and penalties, and to keep Plaintiffs in the dark about the entire scheme to prevent Vimala from receiving its Funds.

163.    The false representations and omissions made by Defendants were made either intentionally, knowingly, without belief in their truth, or recklessly. Specifically and particularly, Defendants' engaged in a scheme of corporate gaslighting meant to deceive Plaintiffs as to the whereabouts of the Funds and their rights to that money. Defendants, through their agents dealing with this matter intentionally and recklessly knew the true status of the money and accounts but purposely used misrepresentations to keep Plaintiffs in the dark, delayed, confused, placated, and otherwise to so deceive Plaintiffs in order to separate Vimala from its money.

164.    Plaintiffs reasonably relied upon the misrepresented facts and omissions. Vimala transacted more than One Million Dollars ($1,000,000.00) in revenue through WFMS. Plaintiffs relied on the representations that the Funds existed and would be paid out and grew their business based upon the existence and availability of the Funds. Alecia on behalf of Vimala hired a workforce, rented warehouse space, made investments in equipment, sets, inventory, incurred liabilities, including taking out millions of dollars in loans to fund the business in the interim, and entered into contracts with multiple vendors for millions of dollars in shoppable video content and advertising, all based upon the representations of Defendants that the Funds existed

for the benefit of Vimala and would be paid out. The reliance was reasonable since Plaintiffs had every reason to believe that a federally-chartered bank that confirmed the existence of the Funds would pay the Funds as they belonged to Plaintiffs and that Defendants were telling the entire facts and not omitting material facts about the status of those Funds.

165.     Plaintiffs suffered damages as a result of the misrepresentations and omissions. Specifically and particularly, Plaintiffs were injured in a manner and to an extent as set forth in para. 125 above which is incorporated fully into this paragraph by reference as if set forth fully herein.

166.     Defendants committed the fraudulent misrepresentations and omissions by use of the US Mail and via the wires.

167.     Defendants are liable for fraud under Tennessee law.

## COUNT FOUR

## CONSTRUCTIVE FRAUD

168.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 167 and incorporates those allegations by reference.

169.     Defendants engaged in an elaborate scheme to obfuscate and prevent Plaintiffs from obtaining their Funds or receiving knowledge of the status, amount, or scheduled payout of the Funds. Defendants entire course of conduct was designed, through a series of misrepresentations, excuses, empty promises, and dangled carrots of future payouts, to prevent Plaintiffs from learning about or obtaining their Funds. Defendants actions have operated as a constructive fraud upon Plaintiffs.

170.     A relationship of confidence and trust existed between Plaintiffs and Defendants.

a.  Plaintiffs placed their confidence and trust in one of the largest federally chartered banks and one of the largest merchant service providers in the country. Because of that confidence, Defendants exercised dominion and control over Plaintiffs.

b.  Defendants inherently had dominion and control over Plaintiffs. Defendants controlled all of the terms of the Agreement, drafted the Agreement (which is an adhesion contract), controlled the means of processing payments, held themselves out as the only option for Plaintiffs, and held millions of dollars of Vimala's Funds.

171.  Due to the relationship which gave dominion and control to Defendants, Defendants had legal and/or equitable duty toward Plaintiffs. Each of Defendants' actions were reasonably expected to influence the conduct of Plaintiffs and Plaintiffs relied on Defendants' actions in order to run the business.

172.  Defendants each, jointly and individually, through their agents, engaged in a series of acts, statements, and omissions which operated as a fraud on Plaintiffs. Specifically and particularly, Defendants engaged in the actions set forth in detail in counts 1-3 above and incorporated herein by reference as though set forth fully in this paragraph.

173.  These representations, statements, and omissions operated as a fraud on Plaintiffs because of their tendency to deceive Plaintiffs and violate the private confidence that Plaintiffs placed in Defendants.

174.  Additionally, Defendants are a nationally-chartered bank and highly-regarded merchant service providers. Defendants' pattern of statements, representations, omissions, and course of conduct have violated public confidence and injured public interests.

175.    Plaintiffs suffered damages as a result of the pattern of constructive fraud. Specifically and particularly, Plaintiffs were injured in a manner and to an extent as set forth in para. 125 above which is incorporated fully into this paragraph by reference as if set forth fully herein.

176.    Defendants are liable for constructive fraud.

## COUNT FIVE
## VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT

177.    Plaintiffs reallege every allegation set forth in paragraphs 1 through 176 and incorporates those allegations by reference.

178.    Defendants have engaged in unfair and deceptive trade practices against Plaintiffs which affect the conduct of a trade or commerce (Tenn. Code Ann. § 47-18-104(a)). Defendants engaged in such practices by making material representations, practices, and omissions likely to mislead a reasonable consumer.

179.    Plaintiffs are consumers. The Tennessee Consumer Protection Act ("TCPA") is applicable in this matter.

180.    The TCPA has declared the following acts or practices as unlawful:

a.    "Representing that goods or services have sponsorship, approval, characteristics, ingredients, **uses**, **benefits** [emphasis added], or quantities that they do not have." (Tenn. Code Ann. § 47-18-104(b)(5))

b.    "Causing confusion or misunderstanding with respect to the authority of a salesperson, representative or agent to negotiate the final terms of a consumer transaction." (Tenn. Code Ann. § 47-18-104(b)(14))

Case 3:19-cv-00513   Document 1   Filed 06/19/19   Page 47 of 64 PageID #: 47

c. "Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve." (Tenn. Code Ann. § 47-18-104(b)(19))

181. Defendants violated TCPA subsections 5, 14, and 19 by engaging in the following Specific unfair and deceptive acts and practices. To wit:

a. According to Part 1: Confirmation Page of the Wells Fargo Merchant Services Program Guide (*See* Exhibit 4), specifically, under Important Member Bank Responsibilities, section d; The Bank is **responsible for and must** (emphasis added) provide settlement Funds to the merchant and "[t]he Bank is responsible for all Funds held in reserve that are derived from settlement."

b. In late fall 2016, Defendants, through Telathourp and others, repeatedly sold WFMS and induced Plaintiffs to enter into the Agreement on the promise that WFMS was the perfect fit for Vimala's volume and held WFMS out as the best merchant services provider for Vimala's needs.

c. In December 2016, Defendants negotiated the terms of the Agreement through Telathourp. Telathourp communicated the terms and answered Plaintiffs' questions, and Telathourp signed the welcome packet and introduction letter on behalf of WFMS. Plaintiffs believed and understood that Telathourp was the name of a real person that had the authority to negotiate the final terms and enter into the Agreement between Vimala and WFMS. Based on evidence, this was false, the communications were misleading, Telathourp was not the real name of any person who had any authority to negotiate the terms of any agreement on behalf of WFMS. This causes confusion and misunderstanding regarding the

Case 3:19-cv-00513   Document 1   Filed 06/19/19   Page 48 of 64 PageID #: 48

ability for Plaintiffs to have ever entered into an Agreement and under what terms with WFMS.

182.     Defendants not only failed to provide all of the settlement Funds to Vimala, in this case, they provided NONE of the settlement Funds. Defendants further has retained for their own benefit the Reserve Deposit account and have refused to return the same to Vimala despite Plaintiffs' demands.

183.     WFMS in its own documents guaranteed and warranted that they would provide settlement Funds to the merchant and be responsible for all Funds held in reserve.  Their refusal to do so is a clear violation of the Tennessee Consumer Protection Act.

184.     Defendants' only use and benefit to Alecia and Vimala was Defendants' promise to provide the settlement Funds into accounts owned by Vimala.  Defendants intentionally and knowingly failed to provide the use and benefit of the Funds by continued refusal to settle Vimala's accounts.

185.     Defendants intentionally warranted and guaranteed the availability of the Funds while intentionally and knowingly failing to provide any such guarantees by appropriating the Funds and the Reserve Deposit account in violation of the Tennessee Consumer Protection Act. The violation was knowing and intentional.

186.     The Defendants represented that their services have specific uses and benefits—namely, the holding of Funds in accounts and the disbursement of those Funds—but the Defendants have repeatedly denied existence of those uses, benefits, guarantees, and warranties.

187.     Defendants actions in deploying an employee using an alias to negotiate and close the final terms of the Agreement creates confusion and misunderstanding regarding the authority of Telathourp, his position, his role, and his true identity in the Agreement. Defendants continued

the charade of Telathourp by repeatedly utilizing this unknown person to return calls, answer questions, and otherwise manage Plaintiffs' relationship. Defendants actions regarding Telathourp represent a pattern of unfair and deceptive acts and practices.

188.     Plaintiffs have been severely damaged by the actions of Defendants as set forth in this complaint.

189.     Defendants' violations proximately caused damages to Plaintiffs.

190.     Defendants are in violation of multiple prohibitions of the TCPA, which entitles Plaintiffs to treble damages and attorneys' fees.

## COUNT SIX

## CONVERSION

191.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 190 and incorporates those allegations by reference.

192.     Vimala is the rightful owner of over more than $1,633,944.62 (the Funds) and $62,000.00 (the Reserve Deposit account) that is currently under the Defendants' control.

193.     Defendants jointly and individually appropriated Vimala's property, for their own use and benefit to the detriment of Plaintiffs. Defendants appropriated over $1,633,944.62 then closed the accounts, keeping the Funds and the Reserve Deposit account for themselves, which they used to earn interest, lend to others, and otherwise enjoy the benefits and value of the Funds.

194.     Defendants repeatedly and continuously exercised control over the Funds from January 2017 to the present. Defendants likewise exercised such control over the Reserve Deposit. Defendants acknowledged that the Funds and the Reserve Deposit exist but continually refusing to pay the Funds to Vimala.

195.     Vimala repeatedly and on multiple occasions demanded that the Funds be settled and paid out. These demands were made via phone, in person, and in writing. Defendants have completely refused to pay Vimala its money. Defendants have acted in defiance of Vimala's—the true owner—right to the property (*White v Empire Exp., Inc*. 395 S.W.3d (Tenn. Ct. App. 2012).

196.     Plaintiffs have been injured by the actions of Defendants.

197.     Defendants are liable for conversion under Tennessee law.

## COUNT SEVEN

## NEGLIGENT MISREPRESENTATION

198.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 197 and incorporates those allegations by reference.

199.     Defendants provided banking and transactional services in their normal course of business.

200.     Defendants owed a duty of care to Vimala and Alecia not to make misrepresentations or to omit material facts.

201.     Pursuant to the Agreement, the Defendants agreed to provide the Plaintiff with credit card processing services, along with accounts and banking services, all necessary tools for the Plaintiff's growing business.  Through those services, Defendants provided information related to the services themselves as well as advice on managing and securing Plaintiff's business as seen in the Wells Fargo Merchant Services Guide to Processing Online Payments (Exhibit 37).

202.     Defendants supplied information intended to guide the Plaintiffs in business transactions. Specifically, among other things, Defendants through their agents, made the following representations:

    a.   That Vimala's Funds would be released by the end of the fourth quarter of 2018. (*See* Exhibits 26 and 27)

    b.   That if Vimala made certain specific changes, Defendants would release the Funds. (*See* para. 64)

    c.   Defendant Telathourp, in his welcome letter to Vimala, stated that he would call Alecia to set up online access and to get Vimala's systems configured correctly. (*See* exhibit 3)

    d.   As early as January 2017, the Bank represented to Plaintiffs that the Funds could not be located as a result of a system error, yet the Defendants also told the Plaintiff on numerous occasions that the money being held would be remitted. Defendants even went so far as to provide a schedule for release dates of Plaintiffs Funds (See Exhibits 27).

203.     The foregoing information provided by Defendants was false.

204.     The Defendants did not exercise reasonable care and due diligence in obtaining or communicating the information and advice.

205.     Vimala justifiably relied on the information (*Homestead Grp., LLC v. Bank of Tennessee*, 307 S.W.3d 746 (Tenn. Ct. App. 2009)).

206.     Vimala, believing that the Funds would be released and relying on the overtures of the Bank, continued to act in a reasonable business manner.  This is evidenced by the fact that

Alecia continued to enter into contracts (See Exhibits 23, 30, 31, 32, and 33) and operate as though the Funds would be released in a timely fashion.

207.    Plaintiffs were injured by the negligent misrepresentations of Defendants, specifically as set forth in this Complaint.

## COUNT EIGHT

## BREACH OF CONTRACT

208.    Plaintiffs reallege every allegation set forth in paragraphs 1 through 207 and incorporates those allegations by reference.

209.    A valid and executed contract existed between Vimala and Defendants executed on December 11, 2016 (*See* Exhibit 38).

210.    At all times Vimala had performed all, or substantially all, its obligations under the contracts and at no time was in breach of these agreements.

211.    The Terms of the Agreement included the following provisions:

a.    The Bank is responsible for and must provide settlement funds to the merchant (*See* Exhibit (5) - Wells Fargo Merchant Services Agreement, Part 1, Page 5).

b.    The Bank is responsible for all funds held in reserve that are derived from settlement (*Id*).

c.    Defendants' other contractual responsibilities included processing credit card payments and chargebacks and providing monthly account statements (*Id.* at Part 1, Page 6).

d.    The absolute longest that Defendants could hold funds for any reason, under specific circumstances, was ten (10) months (*Id.* at Part 11.2, Page 12).

212.     Due to parties intermingled nature, Defendants had joint responsibility for the Agreement.

213.     The actions taken by the Defendants have materially violated the specific terms of its Merchant Services Processing Application and Agreement.

214.     Specifically, Defendants have failed to and continue to refuse to provide merchant services processing account statements and have failed to provide the Funds and Reserve Deposit to the Plaintiffs.

215.     Defendants individually and jointly have breached their most basic contractual duty. By refusing to provide the Funds and Reserve Deposit to Plaintiffs, WFMS has rendered itself useless and by doing so has severely damaged the Plaintiff.

216.     Further, Defendants have breached the Agreement by violating the covenant of good faith and fair dealing. Defendants are liable for the losses of the Plaintiffs that have resulted from their breaches of contract.[1]

217.     Defendants induced Plaintiffs to open multiple accounts all the while never intending to honor the Agreement. Defendants continued to make promises of payment even after it had become abundantly clear that they were never going to release those Funds to Alecia and Vimala. By making promises they never intended to keep, the Defendants have committed Promissory Fraud and Plaintiffs should therefore be awarded punitive damages.

---

[1] Tennessee has long enforced the concept of good faith and fair dealing, in connection with executing contracts. The implied covenant of good faith and fair dealing "does not create new contractual rights or obligations, it protects the parties' reasonable expectations as well as their right to receive the benefits of their agreement." *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 666 (Tenn. 2013)

218. Vimala has suffered and continues to suffer significant damages as set forth fully and specifically in this Complaint

## COUNT NINE

## NEGLIGENCE

219. Plaintiffs reallege every allegation set forth in paragraphs 1 through 218 and incorporates those allegations by reference.

220. In addition to, or in the alternative to the intentional torts pled, and the breaches of contract pled above, Defendants were negligent in their handling of the Funds and Reserve Deposit.

221. Defendants induced Plaintiffs to open three merchant service accounts along with multiple accounts with the Bank, and persuaded Plaintiffs to make an additional Reserve Deposit to ensure more timely release of the Funds. Thus, Defendants owed a duty to Plaintiffs. Defendants had a duty to Plaintiffs to care for the Funds processed through WFMS, to protect the Reserve Deposit and pay them to Vimala.

222. Defendants breached their most important and basic duty owed to Plaintiffs when they failed to provide the Funds and Reserve Deposit to Plaintiffs, instead keeping the Funds and Reserve Deposit causing significant damage to Plaintiffs.

223. Defendants' breach of its duty is the direct, actual, and proximate cause of injuries to Plaintiffs.

224. Plaintiffs have been severely injured by Defendants' negligence as set forth specifically in this Complaint.

225.     The injuries to Plaintiffs (including the loss of the Funds, loss of Reserve Deposit, the ruination of Vimala, loss of contracts, defaults, penalties, and loss of value in Vimala) are the reasonably foreseeable result of not paying out millions in Funds that belonged to Vimala.

226.     Defendants are liable for negligence.

## COUNT TEN

## NEGLIGENT HIRING AND RETENTION

227.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 226 and incorporates those allegations by reference.

228.     Upon information and belief, Defendants knew or should have known about the actions of its employees and contractors acting as agents for Defendants.

229.     Defendants have a duty not to hire or retain employees or contractors that will act intentionally, knowingly, recklessly, or negligently in regard to Plaintiffs.

230.     Upon information and belief, Defendants failed to take steps necessary to ensure that the employees and contractors they hire (including Telathourp) will not act intentionally, knowingly, recklessly, or negligently in regard to Plaintiffs.

231.     Defendants failed to sufficiently investigate the actions of their employees and contractors and failed to discipline them with regards to their actions in regard to Plaintiffs.

232.     Defendants' negligent hiring and retention and other negligent employment practices are a direct and proximate cause of Plaintiffs' injuries.

233.     Defendants are liable for the negligent hiring and retention and for negligent employment practices regarding Telathourp and other employees and contractors of Defendants.

## COUNT ELEVEN

## UNJUST ENRICHMENT

234.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 233 and incorporates those allegations by reference.

235.     Defendants, individually and jointly, have acted in a way so as to unjustly and illegally deprive Alecia and Vimala of profits and value to each of the Defendants' own benefit.

236.     As a result of Defendants' unlawful and deceptive actions described in this Complaint, Defendants were enriched at the expense of the Plaintiffs through their failure to provide Funds from Plaintiffs' Merchant Services Account to Vimala and to return Vimala's Reserve Deposit.

237.     It is unequitable and unconscionable to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs.  In light of the fact that the Defendants used illegal, deceptive, and/or unfair practices to induce and/or force Vimala to continue using Defendants' services, it would be unjust and unequitable for Defendants to retain those benefits without restitution to the Plaintiff (*Advanced Sec. Servs. Evaluation & Training, LLC v. OHR Partners Ltd.,* No. M201700249COAR3CV, 2018 WL 1391626, at *11 (Tenn. Ct. App. Mar. 20, 2018)).

238.     Defendants are liable for unjust enrichment.

## COUNT TWELVE

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

239.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 238 and incorporates those allegations by reference.

240.     Defendants owed a duty to Alecia as founder and owner of Vimala. Defendants held themselves out as resources for small business owners.  In the WFMS Guide to Processing

Page 57

Online Payments (See exhibit 39), the Defendants state. "By choosing Wells Fargo, a leader in merchant payment processing, you have made one of the most important decisions you will make in your business." The guide goes on to say, "Do not hesitate to let us know how we can support you and your financial success."

241.    Further, Defendants had a duty to care for Alecia because Defendants knew the emotional connection entrepreneurs, and people pursuing the American dream have to their small companies and Defendants completely disregarded that connection.

242.    Defendants breached their duty of care for Alecia when they committed multiple fraudulent, and intentional torts against Alecia and her company.

243.    Defendants clearly knew how much time and effort people like Alecia poured into their small businesses as evidenced by the emotional language used in their welcome package. Defendants used Alecia's emotional ties to her business to extort more money and more business from Alecia.

244.    Since doing business with the Defendants Alecia's reputation has suffered in her industry. She was once a highly sought-after entrepreneur and CEO who had her pick of individuals to employ and companies with whom to partner. Now, because of Defendants negligence, Alecia has been branded as someone who cannot pay her debts and someone who cannot be trusted to uphold her end of an agreement. Additionally, as a guarantor on Vimala's debt, Alecia has suffered destruction of her credit score.

245.    Alecia's tarnished reputation is a direct and proximate result of Defendants' actions and omissions which were, at a minimum, negligent (*Rogers v. Louisville Land Co.,* 367 S.W.3d 196 (Tenn. 2012)).

246.     Alecia has been ongoingly injured by the trauma and emotional distress of seeing a business she spent years building and a lifetime dreaming about be pushed to the brink of failure by Defendants.

247.     An injury-producing event does not have to be sudden (*Henderson v. Vanderbilt Univ.,* 534 S.W.3d 426 (Tenn. Ct. App. 2017), *appeal denied* (Oct. 4, 2017)). In this case the emotional damage was done over the course of years, with Alecia being forced to watch helplessly as her dream was being crushed. Defendants are liable to Alecia for damages stemming from the emotional distress they inflicted upon her.

## COUNT THIRTEEN

## TREBLE DAMAGES

248.     Plaintiff realleges every allegation set forth in paragraphs 1 through 247 and incorporates those allegations by reference.

249.     Defendants' fraudulent, tortious actions have been known, intentional, willful, malicious, and in bad faith.

250.     Plaintiffs are entitled to treble damages against Defendants pursuant to the Tennessee Consumer Protection Act, (Tenn. Code. Ann. § 47-18-109) Tennessee common law allowing for treble damages and any other applicable laws (Tenn. Code. Ann. § 47-18-112)).

## COUNT FOURTEEN

## PUNITIVE DAMAGES

251.     Plaintiffs reallege every allegation set forth in paragraphs 1 through 250 and incorporates those allegations by reference.

252. Defendants' fraudulent, tortious actions have been known, intentional, willful, malicious, and in bad faith (Tenn. Code. Ann. § 29-39-104(a)(1)).

253. The acts or omissions were committed by a person employed in a management capacity while that person was acting within the scope of employment, or Defendants were reckless in hiring, retaining, supervising, or training the agent or employee and that recklessness was the proximate cause of the act or omission that caused the loss or injury; or Defendants authorized, ratified or approved the act or omission with knowledge or conscious or reckless disregard that the act or omission may result in loss or injury (Tenn. Code. Ann. § 29-39-104(g)(1)(a-c)).

254. In addition to, or in the alternative to treble damages, Plaintiff is entitled to punitive damages against Defendants.

## COUNT FIFTEEN

## ATTORNEYS' FEES

255. Plaintiffs reallege every allegation set forth in paragraphs 1 through 245 and incorporates those allegations by reference.

256. Defendants' fraudulent, tortious actions have been known, intentional, willful, malicious, and in bad faith.

257. Plaintiff is entitled to Attorneys' fees, costs, and expenses of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial on all claims so triable and judgment as follows:

258. That each Defendant be served with process and made to answer this Verified Complaint;

259. A trial by jury;

260. Awarding the full balance of all of Plaintiff's accounts, including the reserve account, against the Defendants, jointly and severally, in the amount of at least $1,697,944.62 (*See* Exhibits 8-22);

261. Awarding the value of lost contracts and future income against the Defendants, jointly and severally, in the amount of at least $40,000,000.00. (*See* Exhibits 29-32)

262. Awarding damages for penalties and accelerated debts against the Defendants, jointly and severally, in the amount of at least $5,500,000.00. (*See* Exhibits 35-37).

263. Awarding treble damages against the Defendants, jointly and severally, pursuant to applicable laws including but not limited to the Tennessee Consumer Protection Act in the amount of at least

264. **Awarding total damages to Vimala in an amount of at least $141,593,833.86;**

265. Awarding Alecia additional and separate damages for dilution of equity in Vimala and for the loss of value of Vimala in an amount of at least $38,125,000.00.

266. Awarding Alecia additional and separate damages for damage to credit, damage to reputation and emotional distress.

267. Awarding Alecia additional and separate treble damages and punitive damages against Defendants, jointly and severally.

268. **Awarding total damages to Alecia in an amount of at least $114,375,000.00;**

269. Awarding any and all damages, including, compensatory, general, nominal, and punitive and exemplary damages against the Defendants, jointly and severally, as allowed by law.

270. Awarding attorneys' fees against the Defendants jointly and severally, pursuant to applicable laws including but not limited to the Tennessee Consumer Protection Act, in an amount to be determined at a later date.

271. Awarding pre-judgment interest at the maximum rate permitted, against the Defendants, jointly and severally.

272. Awarding post-judgment interest at the maximum rate permitted against the Defendants, jointly and severally.

273. Awarding such other relief as this Court deems just and proper against the Defendants, jointly and severally.

RESPECTFULLY SUBMITTED this the ———— day of June, 2019.

**BARHAM & MAUCERE LLC**

***/s/ SCOTT RAYMOND MAUCERE***

_____
Scott Raymond Maucere, TN BPR # 027407
Admitted to Practice in U.S. District Court
For the Middle District of Tennessee
Attorney for the Plaintiffs
6708 Heritage Business Court
Chattanooga, TN 37421
423.855.1755 O
Scott@b-m.law

*/s/ DANIEL O. BARHAM*

Daniel O. Barham, TN BPR # 034103
Admitted to Practice in U.S. District Court
For the Middle District of Tennessee
Attorney for the Plaintiffs
6708 Heritage Business Court
Chattanooga, TN 37421
423.855.1755 O
Scott@b-m.law

**<u>VERIFICATION</u>**

COUNTY OF _____
STATE OF TENNESSEE

Personally, appeared before the undersigned, an officer duly authorized by law to administer oaths, Alecia Venkataraman, individually and as CEO of Vimala, LLC, parties herein, who first being duly sworn, states that the facts and allegations as set forth in the foregoing Complaint are true and correct to the best of her knowledge, and are given under oath.

Witness my hand at office in _____, _____ County, State of _____, this the _____ day of _____, 2019.


_____
Alecia Venkataraman,
Individually and As CEO of Vimala,
LLC

_____
Notary Public
My commission expires: _____