# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **VIMALA LLC, dba ALECIA**<br>**and**<br>**ALECIA VENKATARAMAN,** | ) <br> ) <br> ) <br> ) | |
| **Plaintiffs,** | ) <br> ) | **Case No. 3:19-cv-00513** |
| **v.** | ) <br> ) | **Judge Eli J. Richardson**<br>**Magistrate Judge Jeffery S. Frensley** |
| **WELLS FARGO BANK, N.A. and WELLS**<br>**FARGO MERCHANT SERVICES, LLC,** | ) <br> ) | **JURY DEMAND** |
| **Defendants.** | ) <br> ) <br> ) <br> ) | |

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SANCTIONS

---

# TABLE OF CONTENTS

**Page**

I. Introduction ............................................................................................................. 1

II. Relevant Factual and Procedural Background .................................................... 3

  A. Plaintiffs' Claims And Their Reliance On Emails Purportedly Exchanged With Wells Fargo ......................................................................... 3

  B. Wells Fargo Put Plaintiffs' Counsel On Notice In Its Answer And Throughout Fact Discovery That The Fake Merchant Services Emails Are Not Wells Fargo Emails and Appear To Be Falsified ............................................. 7

  C. The Expert Report Of Erik Hammerquist Confirms That The Fake Merchant Services Emails Did Not Come From Wells Fargo And That Plaintiff Venkataraman Herself Was Likely Who Falsified Them ................................. 10

  D. Plaintiffs' Expert Does Not Refute the Illegitimacy of the Fake Merchant Services Emails ................................................................................. 16

III. Legal Standards and Argument ............................................................................ 18

  A. Sanctions Are Appropriate Under Rule 11 Because Plaintiffs And Their Counsel Continue To Rely On Falsified Evidence ............................... 18

  B. Sanctions Should Be Imposed Under Rule 37 Because Plaintiffs Produced Apparently Falsified Evidence In Discovery, Testified To That Evidence's Authenticity In Depositions, And Provided The Falsified Evidence To Their Proposed Experts ................................................................................. 20

  C. Sanctions Are Also Appropriate Against Plaintiffs And Their Counsel Pursuant To The Court's Inherent Powers ............................................. 23

IV. Conclusion ............................................................................................................. 24

Certificate of Service ....................................................................................................... 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Penn Line Servs., Inc.,*
    620 F. Supp. 2d 835 (N.D. Ohio 2009)...................................................................19

*Albright v. Upjohn Company,*
    788 F.2d 1217 (6th Cir. 1986) ..............................................................................19

*Amerisource Corp. v. Rx USA Int'l Inc.,*
    No. 02-CV-2514 (JMA), 2010 WL 2730748 (E.D.N.Y. July 6, 2010), *aff'd*
    *sub nom* ...............................................................................................................24

*Aoude v. Mobil Oil Corp.,*
    892 F.2d 1115 (1st Cir. 1989).................................................................................24

*Barron v. University of Mich.,*
    613 F. App'x 480 (6th Cir. 2015) ..........................................................................19

*Carroll-Harris v. Wilkie,*
    No. 2:17-CV-11711, 2019 WL 2205851 (E.D. Mich. May 22, 2019) .............21, 22

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)..................................................................................................23

*Darnell v. Arthur,*
    782 F. App'x 413 (6th Cir. 2019) ..........................................................................18

*Garcia v. Berkshire Life Ins. Co. of Am.,*
    569 F.3d 1174 (10th Cir. 2009) ..............................................................................22

*Harmon v. CSX Transp., Inc.,*
    110 F.3d 364 (6th Cir. 1997) .............................................................................21, 22

*Herron v. Jupiter Transp. Co.,*
    858 F.2d 332 (6th Cir. 1988) .............................................................................18, 19

*Manez v. Bridgestone Firestone N. Am. Tire, LLC,*
    533 F.3d 578 (7th Cir. 2008) ..................................................................................23

*Mann v. G & G Mfg., Inc.,*
    900 F.2d 953 (6th Cir. 1990) ..................................................................................19

*Merritt v. International Ass'n of Machinists and Aerospace Workers,*
    613 F.3d 609 (6th Cir. 2010) ..................................................................................19

*Metz v. Unizan Bank,*
  655 F.3d 485 (6th Cir. 2011) ................................................23

*Murray v. City of Columbus, Ohio,*
  534 F. App'x 479 (6th Cir. 2013) ................................................23

*New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.,*
  432 F. App'x 25 (2d Cir. 2011) ................................................24

*Plastech Holding Corp. v. WM Greentech Auto. Corp.,*
  257 F. Supp. 3d 867 (E.D. Mich. 2017)................................................23, 24

*Pope v. Federal Express Corp.,*
  138 F.R.D. 684 (W.D. Mo. 1991), *aff'd in part and vacated in part*,
  974 F.2d 982 (8th Cir. 1992) ................................................19, 20

*Quela v. Payco-Gen. Am. Creditas, Inc.,*
  No. 99 C 1904, 2000 WL 656681 (N.D. Ill. May 18, 2000) ................................................21

*REP MCR Realty, L.L.C. v. Lynch,*
  363 F. Supp. 2d 984 (N.D. Ill. 2005), *aff'd*, 200 F. App'x 592 (7th Cir. 2006) ...............21, 22

*Schafer v. City of Defiance Police Dep't,*
  529 F.3d 731 (6th Cir. 2008) ................................................23

*Tahfs v. Proctor,*
  316 F.3d 584 (6th Cir. 2003) ................................................19

*Teno v. Iwanski,*
  464 F. Supp. 3d 924 (E.D. Tenn. 2020)................................................19

*Union Planters Bank v. L & J Dev. Co.,*
  115 F.3d 378 (6th Cir. 1997) ................................................19

*Williamson v. Recovery Ltd. P'ship,*
  826 F.3d 297 (6th Cir. 2016) ................................................23

**Rules**

Fed. R. Civ. P. 37 ................................................21

Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo Merchant Services, LLC ("WFMS" and, together with Wells Fargo Bank, "Wells Fargo") hereby submit this memorandum of law in support of their Motion for Sanctions against Plaintiffs Vimala LLC, dba Alecia and Alecia Venkataraman (the "Plaintiffs") and their counsel pursuant to Federal Rules of Civil Procedure 11 and 37 and the Court's inherent powers.

## I.      INTRODUCTION

Wells Fargo moves for sanctions against Plaintiffs and their Counsel under Rules 11 and 37 and the Court's inherent powers due to the fraud Plaintiffs have committed and are continuing to commit upon this Court, and their Counsel's decision to continue prosecuting Plaintiffs' claims despite knowing of the fraud.  Plaintiffs filed a salacious 15-count Complaint seeking over $250 million in damages alleging that Wells Fargo stole millions of dollars processed through merchant accounts belonging to Vimala LLC.  *But Plaintiffs' allegations regarding Wells Fargo are fiction and have been so from the outset of the case because the evidence submitted and relied upon by Plaintiffs is falsified, as expert analysis and the record evidence has now confirmed.*

In support of their allegations, Plaintiffs primarily rely upon purported email communications between Venkataraman and former Wells Fargo employee Anjali Tiwari and alleged Wells Fargo employee "Liz Harrington" regarding merchant accounts, which they have attached to the Complaint and Plaintiffs' Initial Disclosures.  Plaintiffs have also produced and relied on purported emails from "Mike Telathourp" as well as another supposed Wells Fargo employee named "Reynold Watkins" regarding merchant accounts.  No evidence—other than Venkataraman's self-serving testimony—supports the emails' legitimacy.

Since filing the Complaint, the parties have conducted extensive discovery, which has conclusively shown that Plaintiffs' allegations are false.  As a starting point, Plaintiffs do not have,

and never have had, WFMS merchant accounts. Even more egregiously, though, discovery has shown that Plaintiffs' principal evidence—the purported email communications between Venkataraman and Wells Fargo regarding merchant accounts and withheld funds—***has been fabricated by Venkataraman herself.*** From the beginning of this case, Wells Fargo informed Plaintiffs and their Counsel that the emails relied upon by Plaintiffs appeared illegitimate because there have never been Wells Fargo employees named Telathourp, Harrington, or Watkins, and Tiwari, a former bank branch employee, testified that she did not send any emails to Plaintiffs regarding merchant accounts. Wells Fargo also informed Plaintiffs and their Counsel in written discovery of anomalies in the emails' metadata, which demonstrates that they were not sent through Wells Fargo servers operational as of their send date. Most recently, Wells Fargo retained a computer forensic expert to examine the emails purportedly exchanged between Venkataraman and Wells Fargo regarding merchant accounts. The expert confirmed that every one of them was faked. Even worse, the manner in which the emails were faked shows that Venkataraman manually created them using prior authentic emails she received from Wells Fargo Bank in connection with her (real) business banking accounts.

Wells Fargo has repeatedly apprised Plaintiffs and their Counsel of the evidence's falsity, but neither have offered to withdraw this lawsuit nor otherwise remedy the fraud being committed upon the Court. To the contrary, they have doubled down on their position that the emails, as well as the other evidence, are legitimate. Plaintiffs recently produced their expert reports and no less than three of Plaintiffs' experts rely on the fabricated emails in formulating their opinions. Further, since April 19, 2021, Plaintiffs and their Counsel have been in possession of the expert report of Wells Fargo's forensic computer expert whose analysis points to Venkataraman *herself* falsifying the emails, yet Plaintiffs' Counsel continue to press on.

2

Considerate of the gravity of the relief sought herein, Wells Fargo cautiously awaited expert forensic analysis confirming that the emails were fabricated prior to filing this Motion. However, Plaintiffs' and their Counsel's decision to continue multiplying these proceedings based upon falsified evidence must be sanctioned. Thus, Wells Fargo respectfully requests that the Court sanction Plaintiffs and their Counsel under Rules 11 and 37 and its inherent powers, dismiss the lawsuit with prejudice, and award Wells Fargo its attorney's fees and expenses incurred in this lawsuit.[1] Alternatively, Wells Fargo respectfully requests that the Court issue a show cause order requiring Plaintiffs and their Counsel to account for the apparent falsity of this evidence and show cause why the Court should not impose the requested sanctions.[2]

## II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiffs' Claims And Their Reliance On Emails Purportedly Exchanged With Wells Fargo.

On or about June 19, 2019, Plaintiffs filed this lawsuit against Wells Fargo asserting fifteen causes of action and seeking over $250 million in damages. (ECF #1, ¶¶ 264, 268.) Plaintiffs allege that a Wells Fargo employee named "Mike Telathourp" fraudulently induced Venkataraman into opening multiple merchant accounts for her business, Vimala, in December 2016, that Plaintiffs processed "millions" of dollars in sales through these accounts, and that Wells Fargo converted all of the money in the face of Plaintiffs' efforts to locate the funds. (*See* ECF #1.) In addition to Telathourp, Plaintiffs contend that Venkataraman spoke with former Wells Fargo

---

[1] Wells Fargo also respectfully requests an award of its reasonable expenses, including attorney's fees, incurred in connection with this Motion pursuant to Federal Rule of Civil Procedure 11(c)(2).
[2] While not the focus of this motion, additional evidence in this case is likewise fake. For example, Plaintiffs have attached account statements and letters purportedly from Wells Fargo. The record evidence shows that these documents are not Wells Fargo documents and would not come from Wells Fargo. In addition, Venkataraman has testified that certain deposits were made at Wells Fargo contrary to Wells Fargo's procedures and inconsistent with the way Wells Fargo manages accounts. These are just some of the issues that are addressed in Wells Fargo's pending motion for summary judgment.

3

employee Anjali Tiwari and alleged Wells Fargo employees "Liz Harrington" and "Reynold Watkins" regarding the purported merchant accounts and the missing funds.[3] Plaintiffs claim that these latter "employees," along with "Mike Telathourp," concealed the status, location, and amount of funds in the merchant accounts and aided in converting the funds. (*See id.* ¶¶ 139-97.)

Plaintiffs' chief evidence in support of their claims that they were defrauded by Wells Fargo (as opposed to some third party) are a handful of email communications supposedly between the foregoing Wells Fargo "employees" and Venkataraman, which Plaintiffs have attached to the Complaint, produced throughout discovery, or both. With regard to Telathourp's solicitation of Plaintiffs to open up multiple merchant accounts, for example, Plaintiffs produced alleged email communications between Telathourp and Venkataraman in December 2016 relating to setting up Plaintiffs' merchant accounts.[4] As a result of these emails, according to Venkataraman's deposition testimony, Telathourp used a merchant application that Plaintiffs had on file to open up additional merchant accounts in their names. (*See* **Ex. C**, Venkataraman Dep. (Day 1), at 240:9-242:17.)

As to Wells Fargo's alleged "concealment" of Plaintiffs' funds after the accounts were set up, Plaintiffs claim that Venkataraman was provided "conflicting" information regarding the status of the merchant accounts in 2018, only to be told in January 2019 that the accounts and funds did not exist. (ECF #1, ¶¶ 139-48.) To support these allegations, Plaintiffs again principally rely upon emails attached to the Complaint and produced in discovery purportedly between Venkataraman

---

[3] As will be explained below, Plaintiffs have never had a merchant account with Wells Fargo, and Wells Fargo has never had an employee named "Mike Telathourp," "Liz Harrington," or "Reynold Watkins." While Wells Fargo previously employed a bank branch teller named Anjali Tiwari, there is no evidence that Tiwari communicated with Plaintiffs regarding merchant accounts apart from the email communications fabricated by Plaintiffs.

[4] Such communications were produced by Plaintiffs in response to several of Wells Fargo's requests, including Request for Production Nos. 4-5 and 19.

and Wells Fargo employees.  For instance, Complaint Exhibit 26 is an email allegedly sent from Tiwari to Venkataraman on May 22, 2018, stating that Plaintiffs' merchant accounts were "closed and in payout status" and that the withheld funds would be released by the end of 2018:

> ————— Forwarded message —————
> From: Anjali Tiwari
> Date: Tue, May 22, 2018 at 8:24 AM
> Subject: RE: Update + Online Access
> To: Alecia Vimala
>
>
> Dear Alecia,
>
> I have looked into your request and unfortunately since the merchant account is closed and in payout status, there is no option for online access. Per the last statement, the account balance is $601,603.24. The risk review team is processing documentation from the third parties to process and close transactions for the remainder of 2017. I am unable to provide you with an amount and exact date of transfer however if the merchant services department were to complete the review by May 30, the payout schedule listed on your account is as follows,
>
> June $22,000.10
> July $33,911.00
> August $129,017
>
> September $167,622.01
> October $139,117.00
>
> November $113,723.13
>
> December $196,213.00
>
> Please understand, this is estimation based on information available at this time, actual deposits may vary. Any delays in third party vendor verification may delay and postpone the payout schedule. However, the account status does show verification is complete so you should receive full release of funds by close of 2018.
>
> If you have questions, or would like assistance or information, please call or email me and I'll reach back out to the merchant services team.
>
> Thank you, We appreciate your business
>
>
> Anjali Tiwari
> Personal Banker

(ECF #1, Ex. 26.)  Similarly, Complaint Exhibit 27 is supposedly an email from Harrington to Venkataraman on October 26, 2018, confirming that the funds were scheduled to be paid out from the merchant accounts by the end of 2018:

5

```
——— Forwarded message ———
From: Liz Harrington
Date: Fri, Oct 26, 2018 at 1:32 PM
Subject: RE: Release of Funds
To: Alecia Vimala


Alecia,

I understand your frustration and I apologize for your experience. I've reached out to the merchant services team and records show they sent a letter a few
weeks ago to your old address on Harding Pike. Per the letter, they need to confirm your bank account information for the deposit account. Although I
know you mentioned you've done this many times, please confirm again.

As requested, I was able to verify the account is still scheduled for settlement in Q4 of 2018, however, I am unable to provide any details regarding the
delay in the payment schedule provided. I would recommend continuing to call the merchant services customer service team as they may be able to
connect you with someone in management who can give you more answers.

Thank you. We appreciate your business.



Liz Harrington
Business Banker
```

(ECF #1, Ex. 27.)[5]

Since producing the emails purportedly exchanged between Venkataraman and Wells Fargo "employees" regarding merchant accounts (hereinafter referred to as the "Fake Merchant Services Emails"), Venkataraman has testified under oath regarding her purported receipt of the emails. (*See* **Ex. C**, Venkataraman Dep. (Day 1), at 235:13-20 (confirming certain email communications with Telathourp), 265:23-266:3 (confirming email marked as Complaint Ex. 26 is email Venkataraman received from Tiwari regarding merchant accounts), 281:11-23 (confirming same with respect to Complaint Ex. 27 and Harrington). Furthermore, Plaintiffs have provided versions of the Fake Merchant Services Emails to four of their experts, three of whom relied upon the emails in formulating their opinions.

> **B.     Wells Fargo Put Plaintiffs' Counsel On Notice In Its Answer And Throughout Fact Discovery That The Fake Merchant Services Emails Are Not Wells Fargo Emails and Appear To Be Falsified.**

---

[5] In addition to attaching these emails to the Complaint and producing them in document productions, Plaintiffs produced versions of these email communications with their Initial Disclosures. (*See* **Ex. A**, Plaintiffs' Initial Disclosures at p. 6 (referencing dropbox link).) Plaintiffs' disclosures also named Tiwari, Harrington, and Telathourp as individuals with first-hand knowledge of the events at issue. (*Id*. at 4-5.) The fourth employee Plaintiffs purportedly spoke with regarding merchant accounts, Watkins, was not disclosed in Plaintiffs' initial disclosures. Rather, Plaintiffs did not disclose their purported communications with Watkins until July 2020, a year after the Complaint was filed.

From the outset of this case, Wells Fargo has repeatedly put Plaintiffs' counsel on notice that the Fake Merchant Services Emails appear fabricated and that Plaintiffs have apparently premised a $250 million lawsuit on falsified evidence. In response, Plaintiffs' counsel have done ***nothing*** but double down on Plaintiffs' allegations and their reliance on the Fake Merchant Services Emails, multiplying these proceedings and endorsing Plaintiffs' fraud on the Court.

**First**, in its Answer to the Complaint, Wells Fargo denied that Plaintiffs have ever had a WFMS account. (*See* ECF #26.) Wells Fargo likewise denied in the Answer that it has ever had employees named "Mike Telathourp" or "Liz Harrington"[6] and that Exhibits 26 and 27 were emails sent from Wells Fargo. (ECF #26, ¶¶ 30, 107, 111.)

**Second**, seeking to test Wells Fargo's Answer, Plaintiffs served Interrogatory No. 5, which acknowledged that Wells Fargo "indicated that the emails attached as exhibits to the Complaint and produced in Plaintiffs' initial disclosures are 'fake emails'" and asked Wells Fargo to "provide all evidence and justification of that position with supporting evidence." (*See* **Ex. B**, Wells Fargo's Answer to Interrog. No. 5.) In its verified response served in January 2020, Wells Fargo did just that, explaining:

> Exhibit 26 is an email allegedly sent by Anjali Tiwari, a former Wells Fargo branch employee. Wells Fargo searched for the native file of Exhibit 26 in its records and did not locate it. Further, Wells Fargo determined that some of the metadata underlying the "native" version of the email as produced in Plaintiffs' initial disclosures indicates that the e-mail originated from a Wells Fargo server that was decommissioned prior to the date the email was supposedly sent. Also, Exhibit 27 is an email allegedly sent by someone named "Liz Harrington." Wells Fargo

_____

[6] "Reynold Watkins" does not appear in the Complaint because he was not disclosed until July 2020. Nevertheless, Wells Fargo has separately confirmed in various discovery responses as well as deposition testimony that Harrington, Telathourp, and Watkins were never Wells Fargo employees and that the purported email addresses belonging to them do not exist within Wells Fargo's systems. (*See, e.g.,* **Ex. B**, Wells Fargo's Answer to Interrog. No. 5; ECF #78-2 (Wells Fargo's Responses to Second Discovery Requests, Request for Admission No. 11, Request for Production Nos. 2 and 4); **Ex. D**, Chouanard Dep., at 16:21-17:2, 20:5-9, 21:6-10; **Ex. E**, DeVan Dep., at 105:7-25; **Ex. F**, Elliot Dep., at 95:3-13, 99:5-100:6, 103:18-25.)

searched its employee records for "Liz Harrington" and there is no record of such an employee. Further, like the Tiwari email, the "native" email from "Liz Harrington" attached to Plaintiffs' initial disclosures contains metadata that indicates that it originated from a server that was decommissioned prior to the date of the email.

(*Id.*)  That these emails facially originated from a decommissioned server—that is, a server that was no longer in use—rendered their legitimacy impossible.

**Third**, as to Venkataraman's purported email communication with Tiwari in particular, while Wells Fargo previously employed someone named Anjali Tiwari as a bank branch teller, Plaintiffs deposed Tiwari in February 2020.  At her deposition, Tiwari confirmed under oath in no uncertain terms that she ***did not send*** Exhibit 26 to Venkataraman, that she had not seen it prior to this lawsuit, and that she would not have had access to the information contained in the email:

Q: Did you send this e-mail [Exhibit 26]?

**A: No.**

Q: How do you know?

**A:  Because I do not have access to this information, number one.  Second, bank has a very strong security system and anything with dollar amount, account number, Social Security, it won't go out.  Third thing, this is not my language.  That's not the way I write English.  If you check my emails, you will be able to see my style, the way I write English.  Like mine is not American English because I didn't grow up here, and it's not me.  I don't have access to that, any of those.  And as far as the bank's policies/procedures, we are not allowed to send any confidential information to the customer even if we have the access and, in this case, I did not have any access.**[7]

(**Ex. G**, Tiwari Dep., at 109:19-112:15.)

**Fourth**, in July 2020, Wells Fargo responded to requests for admission served by Plaintiffs in their Second Discovery Requests, which attached 19 native emails purportedly between

---

[7] Other Wells Fargo employees deposed by Plaintiffs have likewise confirmed that a Wells Fargo bank branch teller such as Tiwari would not have had access to the merchant information purportedly relayed to Venkataraman in Complaint Exhibit 26.  (*See* **Ex. H**, Phillips Dep., at 95:20-96:6.)

Venkataraman and Telathourp, Tiwari, or Harrington. In the requests, Plaintiffs asked Wells Fargo to "[a]dmit that the selected emails attached as Exhibit 1 passed through (i.e., transmitted through, traveled through, or were sent through) one, some, or all" of the servers referenced by Plaintiffs. (*See, e.g.,* Wells Fargo's Responses to Second Discovery Requests, Request for Admission No. 3 (ECF #78-2).) Wells Fargo primarily denied the request, confirming that only one of the emails with Tiwari, dated May 24, 2016, and dealing exclusively with Plaintiffs' (real) business banking accounts with Wells Fargo Bank, had come from Wells Fargo. (*Id.*) Wells Fargo denied the request as to all of the Fake Merchant Services Emails. In response to this same set of requests for admission, Wells Fargo likewise denied that a number of purported IP addresses associated with the Fake Merchant Services Emails had been in use by Wells Fargo at the time that the emails were supposedly sent, consistent with Wells Fargo's response to Interrogatory No. 5. (*Id.*, Response to Request for Admission No. 1.)

**Fifth**, Wells Fargo produced a composite of requested technical information on the IP addresses and servers purportedly associated with the Fake Merchant Services Emails. Wells Fargo's production included: (1) email server build information and decommissioning dates, (2) an email server inventory listing, and (3) a listing of email servers corresponding to the IP addresses, all of which are consistent with Wells Fargo's previous representations regarding its servers and IP addresses and confirm the illegitimacy of the Fake Merchant Services Emails. In addition to confirming that some of the Fake Merchant Services Emails were purportedly sent from decommissioned servers, which is impossible, this information also confirmed that some of the fake emails were apparently sent from Wells Fargo servers ***before the servers had even been deployed***, another factual impossibility.

Despite Plaintiffs' Counsel's knowledge of the foregoing, they not only continue to prosecute Plaintiffs' claims, but do so signaling their heavy reliance on the Fake Merchant Services Emails. As explained above, four of Plaintiffs' experts were provided some or all of the Fake Merchant Services Emails to review in formulating their opinions, and three of them relied on the emails. Plaintiffs' damages expert, for example, relies on the Tiwari email attached as Exhibit 26 to the Complaint as evidence of Wells Fargo's "pledge" to a payment schedule in May 2018. Similarly, Plaintiffs' expert on bank fraud uses the Fake Merchant Services Emails purportedly between Venkataraman, Harrington, and Telathourp to support his conclusion that Telathourp and Harrington are Wells Fargo "bank insiders" who defrauded Plaintiffs.

**C.** **The Expert Report Of Erik Hammerquist Confirms That The Fake Merchant Services Emails Did Not Come From Wells Fargo And Points to Plaintiff Venkataraman Herself as Falsifying Them.**

Most recently, Wells Fargo retained a forensic computer expert, Erik Hammerquist, to examine 69 emails produced by Plaintiffs and/or their experts[8], including the Fake Merchant Services Emails, to determine whether any originated from Wells Fargo. To conduct his analysis, Hammerquist thoroughly examined the emails' metadata and compared his observations to the composite of server information produced to Plaintiffs and described above. (**Ex. J**, Hammerquist Rpt., ¶¶ 8-11.) The results of Hammerquist's forensic analysis, as outlined in his report, were two-fold:

> ➤ **First**: "The emails produced by Plaintiffs as evidence of communications with Wells Fargo employees regarding Plaintiffs' alleged merchant services accounts ***appear to have been falsified***, and in any event did not originate from or pass through online Wells Fargo servers."

---

[8] Of the 69 emails, 67 were in native form and two of them were PDF renderings. Of the 67 native emails, Plaintiffs produced 30 throughout discovery. Plaintiffs' expert, Mark Lanterman, produced the remaining 37. (*See* **Ex. J**, Hammerquist Rpt., ¶ 8.). Plaintiffs have never explained why multiple versions of the supposedly same emails even exist, and their expert testified that some of the documents produced by Plaintiffs were "tainted." *See* **Ex. I**, Lanterman Dep., at 57:21-58:17. This leaves open the question of Plaintiffs' compliance with their discovery obligations.

> **Second**: "Based on the metadata associated with the apparently-falsified emails, it is likely that ***Plaintiff Alecia Venkataraman altered these emails herself***."

(*See id.* ¶ 6, App'x E-1 (emphasis added).) More specifically, "every email that [Hammerquist] reviewed purporting to have been received by Plaintiff, and that involve communications with Michael Telathourp, Reynold Watkins, and Elizabeth Harrington, appears to have been falsified." (*Id.* ¶ 13.) Further, "every email that [Hammerquist] reviewed purporting to involve communication with Anjali Tiwari, specifically regarding the alleged merchant services accounts, appears to have been falsified." (*Id.*) As for the 13 emails out of the 69 analyzed that do not bear indicia of fraud, they either: (a) do not include any reference to the existence of a merchant services account (that is, they are real emails about Plaintiffs' legitimate bank accounts), (b) no longer contain the associated metadata necessary to authenticate them, or (c) purport to be emails ***from*** Plaintiffs to Wells Fargo, extracted from Plaintiffs' sent box, and therefore bear no metadata linking them to Wells Fargo. (*Id.* ¶ 14.)

With respect to the May 24, 2018 Tiwari email attached as Exhibit 26 to the Complaint and to Plaintiffs' Initial Disclosures, for example, Hammerquist concluded that the various copies of the email produced by Plaintiffs "all include signs of having been altered." (*See id.* ¶¶ 15, 18.) Hammerquist analyzed three native copies of this email:

| Reference # | Date Produced | Subject | Displayed Date Sent |
|---|---|---|---|
| Vim023 | October 18, 2019[9] | RE: Update + Online Access | 5/22/18 6:24:32 AM |
| Vim024 | June 1, 2020 | RE: Update + Online Access | 5/22/18 6:24:32 AM |
| Vim066 | March 26, 2021 | RE: RE: Update + Online Access | 5/22/18 6:24:32 AM |

---

[9] Plaintiffs produced their Initial Disclosures (**Ex. A**) on October 18, 2019, and served their Second Set of Discovery Requests on Wells Fargo inquiring into 19 native emails on June 1, 2020. March 26, 2021 is the date of the production of Plaintiffs' expert, Mark Lanterman.

(*See id.*)  As Hammerquist explained, the metadata indicates that Plaintiffs manually created the email by doctoring the following legitimate email Venkataraman received from Wells Fargo Bank on May 24, 2016 in connection with Plaintiffs' business banking accounts:



See **Ex. L**, Vim002 (the "May 2016 Business Banking Email").  Hammerquist noted evidence of such alterations in the following metadata:

➢ **DKIM "Signature" Values.**  Each copy of the Tiwari email should have the same DKIM "signature," which is unique to the email.  Hammerquist's analysis of the DKIM values in the various versions of the Tiwari email indicate that the values are the same as in the one legitimate email, meaning Plaintiffs **manually created the Tiwari emails using the prior legitimate email from Wells Fargo Bank**. (**Ex. J**, Hammerquist Rpt., ¶ 18(a).)

➢ **Thread-Index Timestamps.**  Copies of the same email should have the same Thread-Index values; in addition, the Thread-Index value "decodes" to the sent date and time of the email.  (*Id.* ¶ 18(b).)  Hammerquist confirmed that the Tiwari emails "decode" to the sent date and time of the legitimate May 2016 Business Banking Email.  This further supports the conclusion that Plaintiffs manually created the fake May 24, 2018 Tiwari email using the May 2016 Business Banking Email.

➢ **Message-IDs.**  The three copies of the May 24, 2018 Tiwari email have an embedded Message-ID (a 38-character string) that differs from the May 2016 Business Banking Email by just one character, a **"nearly impossible" coincidence**.  (*Id.* ¶ 18(c).)  The similarity in Message-IDs is consistent with Plaintiffs having manually modified the May 2016 Business Banking Email to make it appear as if it was sent in May 2018 with different content:

12

| Reference # | Subject | Message-ID |
|---|---|---|
| Vim002 | Thank You For Choosing Wells Fargo Bank | 5F20D9C6E54F8247B828D43739E90C674AB61**F** |
| Vim023 | RE: Update + Online Access | 5F20D9C6E54F8247B828D43739E90C674AB61**Z** |
| Vim024 | RE: Update + Online Access | 5F20D9C6E54F8247B828D43739E90C674AB61**Z** |
| Vim066 | RE: RE: Update + Online Access | 5F20D9C6E54F8247B828D43739E90C674AB61**Z** |

(*Id.,* Table 5)  Hammerquist performed an identical analysis of the three copies of the Harrington email produced by Plaintiffs with their initial disclosures or throughout discovery, and likewise found, based upon an analysis of the metadata, that those emails were manually created by Plaintiffs using another authentic Wells Fargo Bank email that Plaintiffs received in connection with their business banking accounts, this time dated November 25, 2016.  (*See id*. ¶ 19.)

In all, Hammerquist found that the Fake Merchant Services Emails either: (1) lack metadata consistent with that created by Wells Fargo's server protocols; (2) appear to have been altered when forwarded or manually created from other, real emails; (3) appear to have been extracted from Plaintiffs' email sent folder as purported replies to illegitimate emails and therefore did not come from Wells Fargo; or (4) appear to have transited through Wells Fargo servers that were either no longer, or not yet, in use at the time of the email's displayed sent date—again, a factual impossibility.  (*Id.* ¶ 11.)  Indeed, as to this final category, ***all*** of the emails purportedly sent by Telathourp to Venkataraman from December 6, 2016, through May 12, 2017, have metadata indicating that they were sent from servers that were ***not yet deployed*** as of the emails' purported send dates, which cannot happen.  (*Id.* ¶¶ 26-27.)

Hammerquist also explained how easy it would have been for Plaintiffs to create the Fake Merchant Services Emails.  Hammerquist found that the Fake Merchant Services Emails' metadata contains hallmarks of manipulation by Venkataraman using nothing more than her email system,

free or otherwise-readily available text editing software, and the unrelated but authentic emails she received from Wells Fargo Bank in conjunction with Plaintiffs' business banking accounts in 2016. (*Id.* ¶¶ 32-37.) The multiple versions of the Tiwari email produced by Plaintiffs illustrate Venkataraman's efforts to fake the emails by forwarding the May 2016 Business Banking Email to herself and altering it. In one instance, illustrated below, Venkataraman did not bother to change the subject line when she forwarded the falsified email to herself. Nor did she accurately alter the date in the underlying email (in one instance making it "Tue, May 24, 2018" and in the other correcting it to "Tue, May 22, 2018"). *Compare* Complaint Ex. 26 (first picture) *with* Tiwari email produced by Plaintiffs, which is referenced in the Hammerquist report as Vim025 (second picture) (attached as **Ex. M**):



Additional contradictions exist. For example, the language in the emails—which purport to be *the same email*—is slightly different (e.g., in the first email referring to the account as in "payout status" and describing "last statement", and in second email referring to the account as in

"settlement status" and describing "last written correspondence"), as are the supposed payout times and amounts. *Compare* the amounts listed in Exhibit 26 (first picture) *with* **Ex. M**, Vim025 (second picture):



Beyond the metadata, which unquestionably demonstrates the falsification of the emails, these contradictions illustrate the process and effort through which Plaintiffs falsified them.

Wells Fargo produced Hammerquist's report to Plaintiffs and their counsel on April 19, 2021, putting them on further notice of the Fake Merchant Services Emails' illegitimacy as well as Venkataraman's role in creating them.

### D. Plaintiffs' Expert Does Not Refute the Illegitimacy of the Fake Merchant Services Emails.

Plaintiffs proffered their own forensic expert, Mark Lanterman to testify about the Fake Merchant Services Emails. Far from legitimizing them, Lanterman's testimony bolsters the conclusions reached by Hammerquist.

To begin, Lanterman admitted that he observed some of the same anomalies in the Fake Merchant Services Emails described by Hammerquist. In particular, he observed that "one or two emails that [he reviewed] had an encoded time stamp that was different from the time stamp that was on the face of the communication." (**Ex. I**, Lanterman Dep. at 62:12-20; *see also supra* pp. 12-13.)

Lanterman also confirmed many of the premises underlying Hammerquist's conclusions, for instance:

- That an email cannot be sent from a server before the server has been deployed, or after the server has been decommissioned[10];

- That missing or deleted metadata is a potential indicator of email tampering;[11]

- That it is possible to manually alter email metadata, including, for instance, DKIM information[12];

- That identical email metadata in separate emails could indicate email fabrication[13]; and

---

[10] **Ex. I**, Lanterman Dep., at 65:1-67:1 ("Q. Would you agree that it is not possible to send an email from a server that has been decommissioned? A. … If you mean unplugged and stuck in a closet with no power, yeah, that – that system isn't doing anything."); *cf.* **Ex. F**, Elliott Dep., at 60:4-19 (confirming that decommissioned servers are "physically shut down and removed from the network"); *see supra* pp. 13-14.

[11] **Ex. I**, Lanterman Dep., at 32:14-33:5; *see supra* pp. 11-14.

[12] **Ex. I**, Lanterman Dep., at 64:3-6 ("Q. Can DKIM information be manually manipulated in an email? A. It would take some skill, but I believe it could be done."), 110:4-7 ("Q. Sure. Do you agree that it's possible to manipulate email header information in a text editor? A. Yes."); *see supra* p. 14.

[13] *Id.* at 123:5-124:9 ("A. … So often what we see in our investigations is we will see an individual who has decided to fabricate emails, . . . hit reply or hit forward, copy out the body, and then just put the body in and then either save it or drag that new message into a mailbox."); *see supra* pp. 12-14.

- That an email can be altered using text editing software, and then placed back into an email mailbox.[14]

Unlike Hammerquist, though, Lanterman did not review and compare each of the email header fields (like the DKIM values, thread-index timestamps, and message-IDs) against the other emails he reviewed (**Ex. I**, Lanterman Dep., at 134:5-9). Nor did he review all of the emails that Hammerquist did (*see* **Ex. K**, Lanterman Rpt. Att. A, listing only 37 emails; *see also* **Ex. I**, Lanterman Dep., at 58:18-59:16, 96:7-24). That comparative analysis enabled Hammerquist to identify the legitimate "source" emails used to fabricate the Fake Merchant Services Emails, and by not engaging in a similar analysis, Lanterman simply did not reach the level of detail analyzed by Hammerquist. He was therefore unable to apply these premises to the Fake Merchant Services Emails and reach the same ultimate conclusions as Hammerquist. The only reason proffered by Lanterman for not reviewing the additional emails is because Plaintiffs' counsel decided what emails he reviewed.

Rather, taking a different approach, Lanterman testified that the only way he could reach a definitive conclusion about the legitimacy of the emails would be to personally inspect Wells Fargo's servers. (*Id.* at 107:11-108:4.) He also testified that he wanted to examine Venkataraman's computer "to see if [he found] evidence that key emails were, in fact, fabricated." (*Id.* at 96:25-98:4.) Without that further review of hardware—which he did not do—he testified that he could not rule out the possibility that the emails were fabricated. (*Id.* at 105:2-9.) Indeed, he testified that he could not even offer an opinion as to whether the supposed Harrington,

---

[14] **Ex. I**, Lanterman Dep. at 74:11-75:12 ("Q. Would you agree that an altered email could then be put back into an email box after it's been modified with text editing software? A. It could be, yes."); *see supra* pp. 12-14.

Telathourp, and Watkins email addresses themselves were ever actually used by or at Wells Fargo without examining Wells Fargo's email servers. (*Id*. at 94:2-16.)

### III.    LEGAL STANDARDS AND ARGUMENT

The Court has the power to award the relief requested and sanction Plaintiffs and their counsel pursuant to Federal Rules of Civil Procedure 11 and 37 as well as the Court's inherent powers. Because Plaintiffs' evidence appears to be falsified to commit fraud on the Court, and Plaintiffs and their Counsel continue to prosecute the claims in this lawsuit relying on that evidence, sanctions are appropriate under any or all of Rules 11 and 37 and the Court's inherent powers.

### A.    Sanctions Are Appropriate Under Rule 11 Because Plaintiffs And Their Counsel Continue To Rely On Falsified Evidence.

Federal Rule of Civil Procedure 11's function is to "discourage dilatory or abusive tactics and help streamline the litigation process by lessening frivolous claims or defenses." *Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 335 (6th Cir. 1988) (citation omitted). To that end, the rule requires that attorneys "reasonably investigate factual allegations and legal contentions— including their frivolity—before filing a complaint with a federal court." *Darnell v. Arthur*, 782 F. App'x 413, 416 (6th Cir. 2019). The filing of the Complaint does not end an attorney's obligation under Rule 11, however, as the "obligation is not static." *Id.* (quoting *Merritt v. International Ass'n of Machinists and Aerospace Workers*, 613 F.3d 609, 627 (6th Cir. 2010)). Rather, Rule 11 "imposes a continual obligation on attorneys to refrain from pursuing meritless or frivolous claims at any stage of the proceedings." *Id.*; *see also Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 959 (6th Cir. 1990) (citation omitted) ("After the complaint is filed, plaintiffs' counsel retain a continuing responsibility to review their pleadings and, if necessary, to modify them to conform with Rule 11. 'Failure to do so permits the district court, within its discretion, to impose

sanctions against the offending litigant or attorney[.]'"). Rule 11(c) requires "keen observance of this duty" and permits sanctions when a "reasonable inquiry" would disclose that a pleading, motion, or paper is "not well grounded in fact." *Herron*, 858 F.2d at 335 (citations omitted).

In the Sixth Circuit, when deciding whether to impose Rule 11 sanctions, the Court should consider whether an individual's conduct was "reasonable" under the circumstances. *Teno v. Iwanski*, 464 F. Supp. 3d 924, 934 (E.D. Tenn. 2020) (citing *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 384 (6th Cir. 1997)). An "attorney's good faith belief in the merits of the case is not enough to avoid sanctions." *Id.* (citing *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003)). Further, "[f]raudulent behavior is certainly not reasonable" and a "party to the litigation who is responsible for such fraudulent behavior is sanctionable under Rule 11." *Id.* (citations omitted) (sanctioning *pro se* plaintiff under Rule 11 for falsifying documents and being "responsible for the presence in [the] court's file of [the] fraudulent documents"). When Rule 11 is violated, sanctions are mandatory. *See Adams v. Penn Line Servs., Inc.*, 620 F. Supp. 2d 835, 839 (N.D. Ohio 2009) (citing *Albright v. Upjohn Company*, 788 F.2d 1217, 1222 (6th Cir. 1986)).

In *Pope v. Fed. Exp. Corp.*, for example, the Eighth Circuit affirmed Rule 11 sanctions against the plaintiff and her counsel related to their continued reliance on falsified documents created by the plaintiff. 974 F.2d 982, 983 (8th Cir. 1992). There, the plaintiff submitted a falsified document in support of her claim and testified to that document's authenticity as well as to the fact that it had been left on her desk by someone at her employer. *Id.* After expert testimony and demonstrative evidence proved that the document was a "cut and paste composite of other documents" created by the plaintiff, the court concluded that the plaintiff lied during her original and supplemental deposition and that she produced the document "with intent to mislead the court," justifying sanctions under Rule 11. *Id.*

The Eighth Circuit also affirmed the imposition of Rule 11 sanctions against the plaintiff's attorney for continuing to press the plaintiff's claims relying on the document when the document's falsity was apparent. *Id.* According to the district court, the attorney failed to "critically scrutinize" her client's deposition testimony related to the document after the attorney was presented with evidence at that deposition that the document in question contained words that were speciously cut and pasted from others. *See Pope v. Fed. Exp. Corp.*, 138 F.R.D. 684, 688 (W.D. Mo. 1991) *aff'd in part and vacated in part*, 974 F.2d 982 (8th Cir. 1992). At that point, according to the district court, the attorney "should have realized that her client was lying about the document and how it originated." *Id.*

As in *Pope*, this Court should sanction Plaintiffs under Rule 11 for fabricating the Fake Merchant Services Emails, including those attached to the Complaint as Exhibits 26 and 27, in order to defraud the Court. The Court should likewise sanction Plaintiffs' Counsel because, similar to the attorney sanctioned in *Pope*, they continue to press Plaintiffs' claims by relying on the Fake Merchant Services Emails despite evidence demonstrating that they were altered by Venkataraman and, in any event, were not sent by Wells Fargo.

> **B.** **Sanctions Should Be Imposed Under Rule 37 Because Plaintiffs Produced Falsified Evidence In Discovery, Testified To That Evidence's Authenticity In Depositions, And Provided The Falsified Evidence To Their Proposed Experts.**

Under Rule 37(b)(2)(A), "the Court may issue sanctions if a party disobeys a discovery order," including "dismissing the action or proceeding in whole or part." *Carroll-Harris v. Wilkie*, No. 2:17-CV-11711, 2019 WL 2205851, at *4 (E.D. Mich. May 22, 2019) (citing Fed. R. Civ. P. 37). "Although the language of Rule 37 requires a party to violate a judicial directive in order to impose sanctions, a formal, written order to comply with discovery is not required," as courts can "interpret broadly what constitutes an order" for purposes of imposing sanctions. *See REP MCR*

*Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005), *aff'd,* 200 F. App'x 592 (7th Cir. 2006) (citing *Quela v. Payco-Gen. Am. Creditas, Inc.,* No. 99 C 1904, 2000 WL 656681, at *7 (N.D. Ill. May 18, 2000)). This broad latitude "stems from the presumption that all litigants . . . are reasonably deemed to understand that fabricating evidence and committing perjury is conduct of the sort that is 'absolutely unacceptable.'" *Id.*

When considering whether to dismiss a case as a Rule 37 sanction, the Court considers: (1) whether the party's failure to cooperate in discovery is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's failure to cooperate in discovery; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered (the "*Harmon* Factors"). *See Carroll-Harris*, 2019 WL 2205851, at *4 (quoting *Harmon v. CSX Transp., Inc.*, 110 F.3d 364, 366-67 (6th Cir. 1997)). No single factor is dispositive. *Id.* (citing *Barron v. University of Mich.*, 613 F. App'x 480, 484 (6th Cir. 2015)).

The first *Harmon* factor is satisfied when a party commits a fraud on the court by falsifying evidence and producing it in discovery, as such behavior is indicative of "an intent to thwart judicial proceedings or a reckless disregard for the effect of [such] conduct on those proceedings." *Id.* (citation omitted). The second *Harmon* factor—prejudice to the opposing party—is likewise satisfied when a party falsifies evidence produced in discovery, as it typically means the defendant has "been put to enormous additional effort and expense to ferret out plaintiff's lies and to double check every piece of information." *Id.* (citing *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1181 (10th Cir. 2009) and *Realty*, 363 at F. Supp. 2d at 1012). Moreover, producing falsified evidence in discovery causes prejudice because it corrupts the discovery record, "which is of signal importance in modern civil litigation, particularly in high stakes cases . . . , which typically will

settle in advance of trial." *REP MCR Realty*, 363 F. Supp. 2d at 1011. The third *Harmon* factor is not required when a party has submitted falsified evidence in discovery, as "[w]hen a party is willing to submit altered documentation in discovery, an additional warning would be superfluous." *Carroll-Harris*, 2019 WL 2205851, at *7. Finally, with regard to the fourth *Harmon* factor, there are no lesser drastic sanctions to consider when a party fabricates evidence as "when a party fabricates discovery, 'the interests of the judicial system militate strongly in favor of dismissal of the suit so as to deter all litigants from such misconduct in the future.'" *Id.* (quoting *REP MCR Realty*, 363 F. Supp. 2d at 1012 (collecting cases)).

In *Carroll-Harris*, for example, the plaintiff submitted email communications in discovery to bolster her claims against her employer and testified to those emails during her depositions. *Id.* at *1-4. After the court determined that the plaintiff had falsified the emails that she was relying on, it readily dismissed her claims under Rule 37 and the *Harmon* factors. *Id.* at *8. The Court should do the same here. Plaintiffs have produced falsified emails throughout discovery, beginning with those attached to Plaintiffs' initial disclosures. Venkataraman likewise testified to the authenticity of the Fake Merchant Services Emails at her depositions. Further, Plaintiffs provided the falsified emails to their experts, three of whom relied on such emails for their opinions. By producing and relying on evidence evidently fabricated by Venkataraman herself, Plaintiffs have prejudiced Wells Fargo by tainting the discovery record. Due to the nature of Plaintiffs' wrongdoing, there is no less drastic sanction than dismissal. Thus, Rule 37 sanctions are appropriate here and Plaintiffs' claims should be dismissed with prejudice.

### C. Sanctions Are Also Appropriate Against Plaintiffs And Their Counsel Pursuant To The Court's Inherent Powers.

Notwithstanding the Court's authority to sanction litigants and their attorneys under Rules 11 and 37, the Court also has the authority to sanction "bad-faith conduct, as well as conduct that

is 'tantamount to bad faith'" pursuant to its inherent powers.  *Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 872 (E.D. Mich. 2017) (quoting *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)).  Appropriate sanctions for bad faith conduct include the imposition of counsel fees or dismissal with prejudice of the party's claims.  *Id.* (citing *Murray v. City of Columbus, Ohio*, 534 F. App'x 479, 484 (6th Cir. 2013)).  Moreover, the application of sanctions pursuant to the Court's inherent powers are not limited to parties, but likewise extend to counsel and other nonparties should they exhibit bad faith conduct in the course of litigation.  *See, e.g., Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness— the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct.").

Bad faith is "associated with conduct that is intentional or reckless."  *Plastech*, 257 F. Supp. 3d at 872 (citing *Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008)).  A party acts in bad faith when it files a "frivolous suit with an improper motive, or if it commits fraud on the court."  *Id.* (citing *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 301- 02 (6th Cir. 2016)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991) (holding that a court has inherent power to impose sanctions if it finds that "fraud has been practiced upon it, or that the very temple of justice has been defiled").  "Courts have routinely held that a party commits fraud on the court when it fabricates evidence and submits that evidence to the court to support the party's claims."  *Plastech*, 257 F. Supp. 3d at 874 (collecting cases); *see also Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989) (finding plaintiff's fabrication of purchase agreement attached to complaint a "near-classic example" of fraud on the court).

In *Amerisource Corp. v. Rx USA Int'l Inc.*, for example, the court used its inherent powers to sanction the defendants and their nonparty principal for fabricating emails offered in support of the defendants' counterclaims. No. 02-CV-2514 (JMA), 2010 WL 2730748, at *4 (E.D.N.Y. July 6, 2010), *aff'd sub nom. New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25 (2d Cir. 2011). Per the court, the wrongdoers "clearly acted in bad faith with the intent to manipulate th[e] litigation and interfere with the Court's fair adjudication of the matter" by submitting the falsified emails, warranting sanctions. *Id.* at *7.

Applied here, the Court should use its inherent powers to sanction Plaintiffs and their Counsel through the dismissal of this action with prejudice and the award of Wells Fargo's counsel fees and expenses in defending this lawsuit. While Plaintiffs may be the source of the falsified emails, Plaintiffs' Counsel continue to prosecute Plaintiffs' claims in direct reliance on them and with knowledge of their falsity. (*See, e.g.,* ECF #1, Exs. 26 & 27.) Their doing so makes them complicit in Plaintiffs' fraud on the court, warranting sanctions in order to "protect the sanctity of the judicial process." *Plastech*, 257 F. Supp. 3d at 878 (citation omitted).

## IV.     CONCLUSION

For all the foregoing reasons, and pursuant to Federal Rules of Civil Procedure 11 and 37 and the Court's inherent powers, Wells Fargo respectfully requests that the Court grant its motion for sanctions, dismiss this lawsuit with prejudice, and hold Plaintiffs and their Counsel jointly and severally liable for Wells Fargo's attorney's fees and expenses incurred in defending this lawsuit. Alternatively, Wells Fargo respectfully requests that the Court issue a show cause order requiring Plaintiffs and their Counsel to account for the apparent falsity of the Fake Merchant Services Emails and show cause why sanctions should not be imposed.

Dated:  July 20, 2021                          By: */s/ Nellie E. Hestin*
                                                    Jarrod D. Shaw (*pro hac vice*)
                                                    Nellie E. Hestin (*pro hac vice*)
                                                    Jared M. DeBona (*pro hac vice*)
                                                    MCGUIREWOODS LLP
                                                    Tower Two-Sixty
                                                    260 Forbes Avenue, Suite 1800
                                                    Pittsburgh, PA 15222
                                                    Tel: (412) 667-6000
                                                    E-Mail: jshaw@mcguirewoods.com
                                                            nhestin@mcguirewoods.com
                                                            jdebona@mcguirewoods.com


                                                    Woods Drinkwater (BPRN 033838)
                                                    NELSON MULLINS RILEY &
                                                    SCARBOROUGH, LLP
                                                    One Nashville Place, Suite 1100
                                                    150 Fourth Avenue North
                                                    Nashville, TN  37219
                                                    Phone: (615) 664-5339
                                                    E-Mail: woods.drinkwater@nelsonmullins.com

                                                    *Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on July 20, 2021, the foregoing was served via email upon the following:

> Scott Raymond Maucere
> Daniel O. Barham
> Stephen G. Fuller
> Zachery Darnell
> BARHAM & MAUCERE LLC
> 7209 Hayle Industrial Drive
> Suite 210
> Nolensville, TN 37135
> scott@b-m.law
> dan@b-m.law
> steve@b-m.law
> zachery@b-m.law

Dated:  July 20, 2021                      */s/ Nellie E. Hestin*