# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| VIMALA LLC, dba ALECIA and ALECIA VENKATARAMAN, | )<br>)<br>) |
| Plaintiffs, | ) Case No. 3:19-cv-00513 |
| v. | ) Judge Eli J. Richardson<br>) Magistrate Judge Jeffery S. Frensley |
| WELLS FARGO BANK, N.A. and WELLS FARGO MERCHANT SERVICES, LLC, | ) JURY DEMAND |
| Defendants. | ) |

## DEFENDANTS' SUPPLEMENTAL BRIEF
## IN SUPPORT OF MOTION FOR SANCTIONS

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | The Fake Emails Are Central to Any Iteration of Plaintiffs' Case | 2 |
| III. | Respondents Do Not Have Any Evidence to Rebut Hammerquist's Conclusions | 8 |
| IV. | Plaintiffs' Fraud on the Court, Endorsed by Their Counsel, Should Be Addressed Before a Decision on the Merits | 11 |
| V. | Conclusion | 14 |

Defendants Wells Fargo Bank, N.A. ("Wells Fargo Bank") and Wells Fargo Merchant Services, LLC ("WFMS" and, together with Wells Fargo Bank, "Wells Fargo"), hereby submit this supplemental brief in support of their Motion for Sanctions (the "Motion") (ECF #125), as permitted by the Court's November 1, 2021 Order. *See* ECF #167.

I. **INTRODUCTION**

Wells Fargo submits this supplemental brief in support of its Motion to address three issues discussed during the teleconference on November 1, 2021, which relate to the emails that Respondents now acknowledge are illegitimate.[1]

***First,*** despite Plaintiffs' and their Counsel's (together, the "Respondents") representation during the teleconference that Plaintiffs' remaining claims rely primarily on Plaintiffs' *receipt* of the Fake Emails, the Fake Emails themselves—and their origination from outside of Plaintiffs' inbox—are critical to any iteration of Plaintiffs' theory of the case. Plaintiffs' recently-filed opposition to summary judgment recommits Plaintiffs to their allegation that the Fake Emails were transmitted from Wells Fargo servers by so-called "bank insiders." The contents of the Fake Emails likewise underpin Plaintiffs' entire damages theory offered through their purported expert, Efrat Kasznik, who attributes the demise of Vimala to Wells Fargo's refusal to adhere to a merchant payment schedule contained in a May 2018 email fabricated by Venkataraman. Finally, even if Plaintiffs' claims are limited to Wells Fargo's purported failure to warn Venkataraman of the Fake Emails' falsity in early 2019 as Respondents now claim, Plaintiffs still must answer for the Fake Emails themselves. In other words, Plaintiffs cannot sustain any claim against Wells Fargo that relies—in any capacity—on emails that Plaintiffs fabricated.

---

[1] These emails, which are at issue in Wells Fargo's Motion, are referred to as the "Fake Emails."

***Second***, as noted during the teleconference, Respondents have not offered any response or explanation for the many indicia of fabrication highlighted by Hammerquist's analysis. *See* ECF #163 at p. 1. When pressed on the evidence they would produce to refute Hammerquist's findings at a hearing, Respondents indicated only that they would cross examine him on issues with Plaintiffs' productions and particular emails that Venkataraman purportedly sent to Telathourp and Watkins (whom Respondents now admit are not real people). These proffered subjects of cross examination are not new evidence as they are already amply addressed in Hammerquist's report and do not alter or call into question his findings.

***Third***, the crux of Wells Fargo's motion for sanctions is not merely that Respondents pursued claims for which they had no support, it is that Plaintiffs have falsified evidence to fabricate claims against Wells Fargo and commit a fraud on the Court. Such fraud, which has infected the entire record, requires action that should not wait until disposition of summary judgment or trial. If the Court were to wait until after summary judgment and trial to determine whether Plaintiffs fabricated the evidence at the center of their claims and such evidence is fake, all effort and expense incurred throughout that time will have been for naught, to the prejudice of Wells Fargo and the unnecessary burden of the judicial system.

## II. The Fake Emails Are Central to Any Iteration of Plaintiffs' Case.

During the teleconference, Respondents continued to confuse their claims and proffer conflicting theories as to why they are seeking to hold Wells Fargo accountable. In short, at the hearing, Respondents articulated a "failure to warn" theory, and seesawed on whether this theory does or does not depend on the Fake Emails traversing Wells Fargo servers. By contrast, on summary judgment and in their expert reports, Respondents have relied on a theory of direct fraud

2

committed by Wells Fargo through unidentified "bank insiders." These are vastly different legal claims, but reliance on fake evidence to substantiate any theory of liability is sanctionable.

*At the Teleconference.* Respondents argued that they have limited Plaintiffs' claims to theories arising out of Wells Fargo's alleged fraudulent concealment in early 2019—a "failure to warn" premise. In doing so, they seem to *acknowledge* that the emails were not legitimate (at least insofar as Telethourp, Watkins, and Harrington were not real Wells Fargo employees), but hinge their theory on the notion that Plaintiffs received them and believed them to have come from Wells Fargo and told Wells Fargo as much. At times, Respondents indicated that their new theory does not rely on the notion that the Fake Emails were sent from Wells Fargo, and at other times they indicated their theory *does* rely on the Fake Emails traversing Wells Fargo's servers. In Respondents' words:

> MR. BARHAM: … So we don't rely on the e-mails having been from an actual Wells Fargo employee. ***We simply need to rely on the e-mails as part of her reasonable basis for contacting Wells Fargo and asking them to investigate*** properly, which we say that they did not.
>
> THE COURT: … Now, it sounds to me at this stage, what you're relying for these emails on at this stage, based on what I just heard, it's not at all that they are what they purport to be. It's that they were received by the plaintiff, and on their face, they appeared to be from Wells Fargo, and ***that's what matters, whether or not they actually were from Wells Fargo. Is that fair to say?***
>
> MR. BARHAM: … ***Yes, Your Honor.*** …

ECF #168 (Teleconference Tr.) at 12:23-13:13. And a few minutes later:

> MR. MAUCERE: … It's not the same thing to say that, oh, well, she got an e-mail from Wells Fargo; therefore, if it didn't come from them, Wells Fargo is not responsible. If, in fact, Wells Fargo, ***if it did traverse through Wells Fargo's e-mail servers and she did receive it and it did look like that to her, our contention is that Wells Fargo had a responsibility to do something.*** So again, it goes back to this – sort of this hearsay analogy of is it the truth of the matter asserted. Well, we're not saying that it was $900,000 that was promised to be paid back, but it is relevant to what Ms. Venkataraman perceived to be true, and then what she did and what Wells Fargo failed to do in response to that. That's our position; not that there

3

is really someone named Mike Telathourp working at Wells Fargo they haven't revealed. It's more the fact that she believed she was dealing with Wells Fargo. Wells Fargo had an opportunity to take care of the matter and then allowed her to persist in believing that Wells Fargo had this money. That's the basis of our claims and that's how that email evidence fits in.

*Id.* at 15:4-24.

Respondents' representation that the only claims they are pursuing are those under a "failure to warn" theory is contrary to the positions in Plaintiffs' briefing on summary judgment and in their expert disclosures and reports, which rely on the existence of Wells Fargo "bank insiders" who used the aliases of Telathourp, Harrington, and Watkins to send the Fake Emails from inside of Wells Fargo and defraud Vimala.[2]

*On Summary Judgment.* While Plaintiffs did move to voluntarily dismiss all Venkataraman's claims against Wells Fargo (purportedly in response to Wells Fargo's Rule 11 Safe Harbor Letter), they only moved to dismiss a few of Vimala's claims. *See* ECF #114, #115. In addition to Vimala's claim for fraudulent concealment, Respondents still advance claims for common law fraud, fraudulent inducement, various claims of negligence, including negligent retention and hiring, and a claim for violation of the Tennessee Consumer Protection Act ("TCPA"). Wells Fargo moved for summary judgment on each of these claims, and Plaintiffs' opposition thereto highlights that they are still advancing a direct fraud theory against Wells Fargo, predicated on the Fake Emails coming from Wells Fargo.

As an initial matter, Respondents attach the Fake Emails from Harrington and Telathourp to Plaintiffs' opposition to summary judgment, which alone undercuts their representation that

---

[2] Further confusing Plaintiffs' theory is Venkatraman's own testimony that that she met in person with Elizabeth Harrington at a Wells Fargo Bank branch, *see* Ex. A (Venkataraman Day 1) at 277:22-279:23. Respondents now concede that Harrington, Telathourp, and Watkins are not real employees. Plaintiffs' continued whipsaw approach to their claims and positioning of how they intend to use the Fake Emails further supports immediate resolution of the sanctions motion.

4

they have limited Plaintiffs' claims to alleged conduct in or around January 2019. *See* ECF #136 (MSJ Opp.) at Exs. 12-14. Only a PDF of the fake Tiwari email from May 2018 was attached to Venkataraman's communications with Wells Fargo in January 2019. *See* Ex. B (Sanchez Ex. 18). Thus, Wells Fargo was not aware of any emails from Telathourp or Harrington in early 2019 for which it could have concealed a material fact and those emails do not support the theory Plaintiffs now say they are pursuing.

Rather, in opposing summary judgment and arguing that their claim for fraud against Wells Fargo should go forward, Plaintiffs presented not a failure-to-warn theory, but instead the following theory of Wells Fargo's own liability for fraud:

> First, Ms. Venkataraman has and will testify that ***Defendants made false statements of material fact through the apparent authority of Mike Telathourp and the other "Bank Insiders".*** Plaintiff's expert, Mike Olson has opined concerning the use of bank insiders in financial fraud schemes. In his report, Mr. Olson refers to "Mike Telathourp," as an alias used by one or more "Bank Insiders." (Ex. 18, Olson Exp. Rep. ¶ 28). ***The Bank Insiders communicated to Plaintiff through email addresses with the recognized domain "wellsfargo.com" which is operated by and under the control of Defendants.*** (Ex. 19, Lanterman Exp. Rep. ¶21, 23, & 24). According to Mr. Olson's report, ***the email addresses used by the Bank Insiders were actual Wells Fargo email addresses created and used through Defendants' email system*** using a real wellsfargo.com domain. (Ex. 18, Olson Exp. Rep. ¶ 28). The addresses were not spoofed, phishing, or fake emails created to only appear to be from Wells Fargo. (Ex. 19, Lanterman Ex. Rep. ¶ 21). ***The emails traversed through multiple Wells Fargo-owned and controlled servers***. (Ex. 19, Lanterman Ex. Rep. ¶ 26).
> …
> The Telathourp emails evidence a continuing fraud whereby Telathourp and others (again using the wellsfargo.com domain) assured Plaintiffs that its funds would be paid out to it. (Ex. 12, Telathourp Emails; *see also*: Ex. 18, Olson Exp. Rep. ¶ 31). ***Defendants are liable for the acts of the Bank Insiders by way of apparent authority. Plaintiff's forensic email expert, Mark Lanterman, has maintained throughout that the Telathourp Emails passed through wellsfargo.com servers and were received by Ms. Venkataraman***. (Ex. 19, Lanterman Exp. Rep. ¶ 27c).
> …
> Plaintiff has proffered evidence that Defendants knew or negligently acquiesced in Telathourp's exercise of authority. Expert testimony and the metadata of the Telathourp emails supports that ***his emails came from the Wells Fargo systems***. (Ex. 19, Lanterman Exp. Rep. ¶ 26).

5

ECF #136 (MSJ Opp.) at 17-18 (emphases added). Plaintiffs incorporate this same "evidence" to support their negligence and negligent hiring and supervision claims. MSJ Opp. at 27, 28.

Similarly, in support of their argument that their Tennessee Consumer Protection Act claim should survive, Plaintiffs again argued that Wells Fargo bears liability not for a failure to warn, but for the sending of the Fake Emails:

> Based on the record evidence and Ms. Venkataraman's testimony verifying the same, **_Telathourp acted through the Wells Fargo email system_** with (at a minimum) the negligent acquiescence of Defendants. (Ex. 19, Lanterman Exp. Rep. ¶ 27c).. … **_Defendants allowed this to happen, and Telathourp was able to scam Plaintiff through Wells Fargo's email system on Defendant's watch_**. (Ex. 19, Lanterman Exp. Dep. ¶ 20, 21, 23, 24, 27c). Further, their lax and negligent allowance of Telathourp to exploit the email system created a "confusion or misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a consumer transaction." (Ex. 18, Olson Exp. Rep. ¶ 21-31).

ECF #136 (MSJ Opp.) at 23 (emphases added). Plaintiffs thus present the Fake Emails as having come from Wells Fargo, as proof of Wells Fargo's fraud on Plaintiffs and not merely for Plaintiffs' reliance on the Fake Emails.[3]

*In Damage Expert's Report.* The Fake Emails are also at the heart of Plaintiffs' damages theory offered by their expert, Efrat Kasznik, who offered opinions on the lost value of Vimala's business and the cause of the business's failure. In particular, Kasznik opined that Vimala entered into licensing agreements "based on a distribution schedule pledged by Wells Fargo from

---

[3] Plaintiffs' position that the Fake Emails came from Wells Fargo, and that that fact is material, is likewise apparent from their Response to Wells Fargo's Statement of Facts ("SOF"), as well as their own Statement of Facts in opposition to summary judgment. In response to Wells Fargo's SOF, Plaintiffs maintain that the fake Tiwari email attached as Exhibit 26 to the Complaint "traversed Wells Fargo servers." ECF #134 (Resp. WF SOF) ¶ 60. Moreover, in Plaintiffs' own SOF, Plaintiffs state that the "emails purported to have been sent from Michael Telathourp originated from Defendants' controlled domain and traversed through Defendants' servers prior to being delivered to Plaintiffs' Gmail account." ECF #135 (Pls. SOF) ¶ 10. These are the purported facts that Plaintiffs are continuing to rely on in pursuit of their claims.

[Vimala's] Merchant Services Account." *See* Ex. C (Kasznik Rpt.) § V.1 at p. 19. This promised "schedule" is the fake Tiwari email supposedly sent to Venkataraman in May 2018. *Id.* at p. 19 n. 53. Kasznik then attributed the demise of Vimala in November 2018 to Wells Fargo's "failure to remit [those] funds" as promised in the fake Tiwari email. *Id.* at § V.2.a at p. 21. In other words, Plaintiffs' damage theory, as set forth by their expert, is: 1) that Wells Fargo had Plaintiffs' money; 2) Wells Fargo promised the money to Plaintiffs in the fake Tiwari email; 3) Wells Fargo did not release the money as promised in the fake Tiwari email; and 4) that failure caused Vimala to collapse in November 2018. Each of these building blocks is based on the legitimacy of the fake Tiwari email *and the truth of its contents*—not merely Plaintiffs' receipt of the email.[4]

*Any Use of Fake Emails Is Sanctionable.* Finally, even if the Court were to accept that Plaintiffs' claims are now limited to Wells Fargo's alleged fraudulent concealment in early 2019 (after Vimala had already collapsed), Plaintiffs still base these allegations on fraudulent actions taken by someone with "access to Wells Fargo's system" to send the Fake Emails. ECF #168 (Teleconference Tr.) at 9:13-16 ("Plaintiff feels that she was defrauded by somebody who was acting under the color of Wells Fargo, with the apparent authority of Wells Fargo, and had some sort of access to Wells Fargo's system."). Otherwise, Respondents claim the Fake Emails are

---

[4] Indeed, Plaintiffs' muddled theory of liability and shifting claims continue to prejudice Wells Fargo and delay this case. For example, if Plaintiffs had narrowed their claims to what they said during the teleconference, Wells Fargo would have had additional grounds for summary judgment including lack of damages, as Plaintiffs conceded at the teleconference that they are "not saying that it was $900,000 that was promised to be paid back . . ." ECF #168 (Teleconference Tr.) at 15:13-24. They likewise conceded in their reply in support of voluntary dismissal that, however Plaintiffs were defrauded (if they were at all), that fraud "does not seem to include Plaintiffs' funds having been held in a Wells Fargo account." ECF #128 (Reply to Mot. for Voluntary Dismissal) at 1. But, that is precisely what their damages expert opined in her report and during her deposition. In fact, Kasznik testified that "[i]f there were no funds [held at Wells Fargo], then we can all go home" because Plaintiffs "wouldn't have a case[.]" *See* Ex. D, Deposition of E. Kasznik, at 66:20-24.

relevant even if they were not sent from Wells Fargo "[a]s long as [Venkataraman] believed them to be from a Wells Fargo employee" because it would show she had a "reasonable basis for contacting Wells Fargo and asking them to investigate properly[.]" *Id*. at 12:10-13:16 (where Respondents compare their reliance on the Fake Emails to a hearsay exception where the emails are not offered for their truth, but for the fact they "were in existence and created an impression and a reasonable belief" in Venkataraman). Yet, Plaintiffs cannot have justifiably relied on the Fake Emails, and certainly cannot have attributed them to Wells Fargo, if they only have ever existed in Plaintiffs' inbox *because Venkataraman created them*. Thus, that the Fake Emails were fabricated by Venkataraman remains a central concern regardless of the theory Respondents pursue.

### III. Respondents Do Not Have Any Evidence to Rebut Hammerquist's Conclusions.

Wells Fargo has presented unrefuted expert testimony from Hammerquist on the numerous indicia of fraud in the Fake Emails. Respondents did not point to any contradictory evidence in their opposition to the Motion, which Wells Fargo pointed out in its reply (ECF #63 at pp. 1-2), nor did they at the teleconference when asked what evidence they would present at a hearing.

Respondents' primary point of rebuttal is to offer the self-serving testimony of Venkataraman that she received the Fake Emails and did not fabricate them. *See* ECF #168 (Teleconference Tr.) at 19:7-20:25. Otherwise, Respondents represented to the Court that the evidence they can produce relies on their ability to "bring a strong cross-examination" of Hammerquist, which would purportedly reveal "inconsistencies, logical falsities, and incorrect conclusions[.]" *Id.* at 25:12-26:24. The only purported inconsistences Respondents could identify, however, relate to non-issues that Hammerquist's analysis took into account; namely, (1) the 13 emails that Hammerquist found do not bear indicia of falsification, and (2) deficiencies in the way

8

Plaintiffs produced a subset of the Fake Emails, which Respondents claim caused them to lack DKIM information. *Id.* at 26:25-32:10.

As for the 13 emails that do not bear indicia of fraud, Hammerquist explained that they either (a) do not include any reference to a merchant services account; (b) do not contain the necessary metadata to analyze; and/or (c) represent emails *from* Venkataraman purportedly to Telathourp or Watkins from Plaintiffs' sent box. ECF #126-10 (Hammerquist Rpt.) at ¶ 14. Hammerquist did not suggest that these emails are real, just that on their face, he did not observe indicia of falsification. Hammerquist explained that as to the final category, because they were merely pulled from Plaintiffs' sent box, they "do not contain information in their headers to prove whether were received by a legitimate Wells Fargo mailbox." *Id.* at ¶¶ 28-29. Nevertheless, because each of the emails represented replies to emails that Hammerquist otherwise identified as inauthentic, he also opined that these emails *from* Venkataraman to purported Wells Fargo employees are likely fabricated as well. *Id.*, Table 12. These emails thus do nothing to undermine Hammerquist's conclusions as to the Fake Emails.

As for the purported issues with Plaintiffs' production, Respondents avoided any discussion of them in their opposition despite otherwise discussing the "three separate productions of emails" relevant to the Motion. *See* ECF #144 (Opp. to Sanctions) at pp. 18-19. In any event, the emails that lack DKIM information do not change the strength of Hammerquist's opinions. Hammerquist was aware of the various productions of the Fake Emails and documented the date each subset was produced in Appendix C of his report.[5] *See* ECF #126-10 (Hammerquist Rpt.) App'x C. Hammerquist likewise noticed that all the emails produced on June 1, 2020 lacked

---

[5] In fact, it was Defendants who alerted Respondents of potential issues with their production of the emails during discovery.

9
Case 3:19-cv-00513   Document 172   Filed 11/11/21   Page 11 of 18 PageID #: 6039

DKIM information. *See id.* ¶ 21, App'x E-3. However, this was just one of multiple sets of the emails produced and one of numerous indicia of fraud in the 56 total emails identified by Hammerquist as fake. *See id.* at ¶ 8, App'x C (only 18 of the 56 emails Hammerquist determined reflected falsification were part of the tainted June 1, 2020 production); *see also* ECF #144 (Opp. to Sanctions) at pp. 18-19. Importantly, the emails analyzed by Hammerquist also included the complete set extracted and analyzed by Lanterman, which Respondents described as "pristine emails with all correct metadata," and which all supported Hammerquist's conclusions of falsification. *See id.* at 19.

For example, Hammerquist analyzed three versions of the fake Tiwari email purportedly sent in May 2018: Vim023 (produced by Plaintiffs 10/18/19), Vim024 (produced by Plaintiffs 6/1/20), and Vim066 (produced by Lanterman 3/26/21). *See* ECF #126-10 (Hammerquist Rpt.) at ¶ 18, Table 1. Even assuming, *arguendo*, that Plaintiffs' faulty production caused Vim024 to lack DKIM information, the bulk of Hammerquist's analysis and conclusions as to the fabrication of these emails derive from his analysis of Vim023 and Vim066, for which he was able to analyze DKIM values, thread-indexes, message IDs, and MIME boundaries. *Id.* at ¶ 18. From his analysis of all these other components in Vim023 and Vim066, Hammerquist was able to reach the conclusion that Vim023 and Vim066 were manually fabricated, separate and apart from any purported issues caused by Respondents' failure to make proper productions of the Tiwari email.

The same was true as to Hammerquist's analysis of the fake Harrington email allegedly sent to Venkataraman in October 2018. There were similarly three versions of this email produced: Vim027 (produced by Plaintiffs 10/18/19), Vim028 (produced by Plaintiffs 6/1/20), and Vim067 (produced by Lanterman 3/26/21). *See id.*, Table 1. Hammerquist analyzed each of these emails and noticed that Vim028, like the Tiwari email produced on June 1, 2021, lacked DKIM

information. *See id.* at ¶ 19. Nevertheless, Hammerquist was able to analyze the DKIM information, thread-indexes, message IDs, and MIME boundaries for Vim027 and Vim067 and conclude from just those that the Harrington email was fabricated using other emails that Venkatraman had received from Wells Fargo Bank. *Id.*

Any purported issues with Plaintiffs' productions also fail to rebut Hammerquist's conclusions as to the Telathourp emails. Hammerquist was able to determine that the Telathourp emails were fabricated without resort to their DKIM values, as their metadata indicated that they were sent from servers ***not yet deployed*** as of the emails' purported send dates, which is impossible. *Id.* at ¶¶ 26-27.

In sum, Respondents do not have any new evidence to present to the Court that would undermine Hammerquist's expert analysis.[6]

### IV. Plaintiffs' Fraud on the Court, Endorsed by Their Counsel, Should Be Addressed Before a Decision on the Merits.

Wells Fargo's Motion should be decided prior to summary judgment to prevent continued prejudice and harm to Wells Fargo and ongoing fraud upon the Court. Wells Fargo has moved for sanctions under Rules 11 and 37 and the Court's inherent powers not only because Plaintiffs' claims lack evidentiary support, but because they are based on falsified evidence. This distinction between sanctions based solely on lack of evidentiary support versus those based on the creation of fake evidence is important because it calls for immediate action under the Court's powers to

---

[6] Plaintiffs' own expert has not offered any rebuttal to Hammerquist's opinions. When asked directly whether Plaintiffs dispute the conclusions in paragraphs 11(a) through (g) of Hammerquist's report, Respondents had this to say about their own expert's analysis: "[W]hen the Hammerquist report was initially disclosed to us when we shared it with our expert, he contended that, you know, a lot of these conclusions or most of the conclusions did not mean that ***his own report*** was inaccurate." ECF #168 (Teleconference Tr.) at 20:8-12. Mr. Lanterman thus did not dispute the accuracy of Mr. Hammerquist's analysis, only (according to Respondents) defending that it did not render all of Lanterman's own report wrong.

sanction and eliminates any judicial economy that may otherwise result from the Court first deciding summary judgment and proceeding with trial.

The Court's authority to impose sanctions is most important when a litigant has falsified evidence and corrupted the record. Indeed, such conduct is considered a "near-classic example" of fraud upon the Court, which creates a situation where the "court's inherent power to dismiss a case and protect the sanctity of the judicial process is never more compelling[.]" *Plastech Holding Corp. v. WM Greentech Auto. Corp.*, 257 F. Supp. 3d 867, 874 (E.D. Mich. 2017) (citations omitted). The submission of falsified evidence also creates almost *per se* liability under Federal Rule of Civil Procedure 37, because when a party submits false proof it satisfies the *Harmon* factors by evidencing "an intent to thwart judicial proceedings," causing the opposing party to undergo "enormous additional effort and expense to ferret out the plaintiff's lies," and corrupting the discovery record, "militat[ing] strongly in favor dismissal of the suit so as to deter all litigants from such misconduct in the future." *Carroll-Harris v. Wilkie*, No. 2:17-CV-11711, 2019 WL 2205851, at *5, 7, 8 (E.D. Mich. May 22, 2019) (citations omitted). If the Court presumes for purposes of summary judgment that the Fake Emails are authentic or otherwise allows this case to proceed to trial, the Respondents' fraud on the Court will be multiplied, as will the prejudice that Wells Fargo has already suffered in "ferreting" out Plaintiffs' lies.

Further, Wells Fargo recognizes that there may be cases where disposition of summary judgment prior to a motion for sanctions promotes judicial economy, as the Advisory Committee Notes to Rule 11 provide that when a party has enough evidence withstand summary judgment, they typically have enough "evidentiary support" for purposes of Rule 11. *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 385-86 (6th Cir. 1997) (citing Fed. R. Civ. P. 11, Advisory Committee Notes (1993)). However, this is not one of those cases. The Sixth Circuit has made

12

clear that it does not believe the drafters of Rule 11 "intended the anomaly of insulating from the rule's reach a dishonest litigant who presented false testimony to overcome summary judgment." *Id*. Thus, "consistent with the purposes behind Rule 11," "litigants cannot avoid sanction under the rule simply by defeating summary judgment on the basis of false evidence." *Id.* at 386.[7] Accordingly, even if the Plaintiffs defeat summary judgment, the question of sanctions and whether the evidence is faked will still be before the Court, but with much greater risk of harm to Wells Fargo and the judicial process.

This is evident from *Union Planters*, where the defendants were sanctioned after a bench trial that confirmed their false testimony despite their earlier success in overcoming summary judgment. *Id.* at 385-86. There, the Sixth Circuit acknowledged that had the false evidence not infected the record, summary judgment likely would have been granted and "both [the plaintiff]

---

[7] As alluded to in footnote 2 of the Court's October 19, 2021 Order, the Fake Emails are just one, albeit central, piece of the story that Plaintiffs have fabricated in pursuit of their false allegations against Wells Fargo. For example, Venkataraman also testified that she regularly called the WFMS customer service number, but both parties subpoenaed her phone records and Wells Fargo records such calls, and there is no trace of any such calls ever having been made. *See* ECF #119 at pp. 13-14. Further, Plaintiffs or their investors have produced various versions of purported WFMS statements for Vimala, which do not comport with Wells Fargo graphics and are inconsistent with each other. *Id.* at pp. 12-13. What's more, Plaintiffs claim Venkataraman was faxed these statements from Wells Fargo but there is nothing on them to indicate that is how they were sent or any evidence to show they were sent at all. *Id.* Plaintiffs also claim that Venkataraman went into a Wells Fargo Bank branch to fund her WFMS "reserve" account with several checks totaling approximately $62,000, but there is no trace whatsoever of these deposits despite Venkataraman stating that she used her debit card and required managerial assistance to complete them, nor could Venkataraman produce a receipt, a cancelled check, or even the names of the drawers of the checks. *Id.* at pp. 9-10. Finally, Plaintiffs have fabricated documents and communications with other merchant processors in the same way they have with respect to Wells Fargo. Venkataraman testified that Stripe is holding more than $1 million in Plaintiffs' funds, but Stripe was subpoenaed and Vimala only transacted approximately $600 through Stripe accounts. *Id.* at pp. 18-19. Moreover, Venkataraman sent her investors and lenders purported "screenshots" and communications with Stripe and Flagship showing hundreds of thousands of dollars' worth of Vimala's sales being held in merchant accounts, which both processors have rejected in sworn declarations. *Id.*

and the court would have been spared the need to undergo a full trial." *Id.* at 386. The same is true here. There is overwhelming evidence that the Fake Emails were fabricated by Venkataraman, which Respondents cannot rebut. As a result, addressing the Fake Emails prior to summary judgment will help to resolve Plaintiffs' reliance on those emails in their opposition to summary judgment because the Fake Emails infect every aspect of their case. The Court should not wait until after summary judgment, trial, and months more of expense and effort to weed out evidence which, if determined to be fake now, would spare all involved enormously.

V. **CONCLUSION**

Respondents have not abandoned their reliance on the notion that the Fake Emails came from Wells Fargo; this contention remains at the heart of any version of Plaintiffs' case theory. It is also clear that Respondents have no meaningful evidence to rebut Hammerquist's findings. Accordingly, and because there would be no judicial economy in waiting to dispose of the Motion until after summary judgment or trial, the Court should grant the Motion and dismiss this lawsuit with prejudice. Additionally, Wells Fargo respectfully maintains that the Court should award Wells Fargo its fees and costs in bringing the Motion under Rule 11(c)(2).

| | |
|---|---|
| Dated: November 11, 2021 | */s/ Nellie E. Hestin* |
| | Jarrod D. Shaw (*pro hac vice*) |
| | Nellie E. Hestin (*pro hac vice*) |
| | Jared M. DeBona (*pro hac vice*) |
| | MCGUIREWOODS LLP |
| | Tower Two-Sixty |
| | 260 Forbes Avenue |
| | Suite 1800 |
| | Pittsburgh, PA 15222 |
| | Phone: (412) 667-7909 |
| | nhestin@mcguirewoods.com |
| | jshaw@mcguirewoods.com |
| | jdebona@mcguirewoods.com |
| | |
| | Woods Drinkwater (BPRN 033838) |
| | NELSON MULLINS RILEY & |

SCARBOROUGH, LLP
One Nashville Place, Suite 1100
150 Fourth Avenue North
Nashville, TN 37219
Phone: (615) 664-5339
woods.drinkwater@nelsonmullins.com

*Attorneys for Defendants Wells Fargo Bank, N.A. and Wells Fargo Merchant Services, LLC*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 11, 2021, the foregoing was served via email upon the following:

>Scott Raymond Maucere
>Daniel O. Barham
>Steven G. Fuller
>Zachery Darnell
>BARHAM & MAUCERE LLC
>7209 Hayle Industrial Drive
>Suite 210
>Nolensville, TN 37135
>scott@b-m.law
>dan@b-m.law
>steve@b-m.law
>zachery@b-m.law

Dated: November 11, 2021 /s/ *Nellie E. Hestin*