| | |
|---|---|
| **From:** | Zachery Darnell |
| **To:** | scott; Hestin, Nellie E.; Daniel Barham; Scott Maucere |
| **Cc:** | pSmalto; Shaw, Jarrod D. |
| **Subject:** | RE: pSmalto - status for responses expected today 10/24 |
| **Date:** | Wednesday, October 26, 2022 2:54:00 PM |

Mr. Cooper,

On review of your requests for information and the scope of the issues presented to you, we feel obligated to raise the following objections. However, despite these objections, we have endeavored to provide you with all of the information available to us subject to the Court's limiting instructions regarding the ordering of additional discovery.

First, we object that some of your requests appear to exceed the scope of the court's mandate for the special master in its order appointing the special master (Doc. 188) ("Order"). The court appointed the special master for the limited purpose of determining "first, which (if any) of the allegedly fabricated emails raised in Wells Fargo's Motion for Sanctions (Doc. Nos. 125, 126) were fabricated; and, if so, second, which (if any) of such fabricated emails were fabricated by Plaintiff Venkataraman (hereinafter the "Delegated Issues")." (188: 2-3)The requests at hand seek information, that we believe, exceed that limited purpose.

Our second objection is based on the grounds that your requests exceed the discovery that was made and produced by all parties in this case. As indicated below, much of the information requested was not a part of the body of discovery. The Order prohibits additional discovery being carried out ("the Special Master shall not have the authority to order additional discovery from any party, whether fact or expert") (188: 4). We have attempted to notify you in previous responses and submissions when a request exceeds the scope of discovery.

Finally, we object that some of these requests, and ongoing work performed by the special master and his staff regarding the subjects that exceed the scope of the Delegated Issues, create an ongoing and unreasonable financial hardship to Plaintiffs. As already disclosed to the court, the appointment of the special master creates a difficult financial situation for Plaintiffs; additional services performed by the special master in excess of its authority under the Order create additional financial burdens on Plaintiffs.

Subject to the above objections and reserving all rights in the same, in an effort to be as cooperative as possible, Plaintiffs respond to your requests as follows:

1. 9/27 email, item A-3 ("who generated"), Mr. Darnell's answer was:

    "All of this **data came from** the e-commerce/campaign backend (i.e. Shopify). Ms. Venkataraman said that it is her memory that these were exports used to reconcile accounts at the end of a campaign. The data for each campaign **would be exported** from the e-commerce system and/or backend system in use for that campaign (Shopify, Woocommerce, etc). It was as simple as selecting a report type, a date range, and clicking **export which would generate a csv file**. That file would be opened, and the data

would be added as a tab to the master excel sheet for each account. The data was updated each time a campaign was closed, so the file was continually updated over many months with multiple people involved."

My follow-up:
After our preliminary exam of the QuickBooks ("QB") access that we were provided, it appears that the data is not contained within QB. You reference "the e-commerce/campaign backend (i.e. Shopify)".

Specifically (not "i.e."):
    a. Where (i.e. what system/data source) did the 3 spreadsheets ("SS") come from?

The three spreadsheets were compiled from e-commerce system and/or backend system that was being used for the individual campaign. The data was extracted as a .csv file and then be added to master excel sheet.
    b. Where are those systems/data sources now?

Plaintiff no longer has access to those systems.
    c. Who generated the exports/.CSV files?

Multiple people were/could have been involved it is unknown who generated specific portions of the .csv files.
    d. Where are (and please provide) the original .CSV files?

The files that have already been provided represent everything the Plaintiffs have in their possession.

2. 9/27 email, item A-4 ("sales tax returns"), Mr. Darnell's answer was:

"Vimala was a service provider, so Vimala's services were not taxable, and it was not required to collect or remit sales tax for the services provided. Vimala only had Nexus in Tennessee, so it filed $0 sales tax returns in TN. . . . We have included Ms. Venkataraman's and Vimala, LLC's federal tax returns along with the state sales tax documents in order to provide additional context."

My follow-up:
After our preliminary exam of the recently provided tax documents: From the previously provided 3 SS, the January 2017 campaign of ICSP has approximately: 400 transactions, for 800 units, at $55, for a $50k gross sales, with $11k of returns, (thus $39k of net sales), $2k of sales taxes, for a total net of $41k.

a) Can Ms. Venkataraman (or if not her, then can someone else) explain the discrepancy between "no sales tax returns" versus the reported $2k of sales taxes charged as related to just the 1/'17 ICSP campaign?

The tax returns and QB data show gross revenues in 2016 of $0 and in 2017 of $121k. The 3 SS show 2017 transactions totaling approximately: $1.6mm gross sales, $100k returns, $1.5mm net sales, and $33k of taxes.
For 2017 transactions, QB shows:
    · "2017 Uncollected Pre-Sales" of just 3 journal entries ($801k, $429k, and

$314k = $1.5mm), all made on 12/31/2017 (presumably made by Michael Vaden, of the Vaden Group, during his QB access of 1/20/2018 854am-922am, and not during his most recent prior access of 12/6/2017 at 900am)
- "Other Income" of $121k from the Skyway Studios Settlement
- "Sales" of only $209 from 4 Stripe transfers in December (11 ($23), 26 ($61), 27 ($39), and 28 ($86))
- No entries for any product returns or sales taxes.

<span style="color:red">As stated before, Vimala was not required to report or remit sales tax, but the retailers were. So if a retailer had nexus in a state, the e-commerce system would automatically calculate what tax needed to be paid on that sale. So the $2K in sales tax for the ICSP campaign is was what the e-commerce system calculated would be owed by the retailer (the entity of record, selling the item). Vimala was not responsible for this, therefore, it's not included on Vimala's sales tax return or in Vimala's books.</span>

b) Can Ms. Venkataraman (or if not her, then can someone else):
  i) explain the discrepancy between the noted QB and SS income/etc. data versus the filed/provided tax returns?
  ii) confirm that it was the Vaden Group that made those 3 journal entries, or if not, then who?

<span style="color:red">Vimala was on a "cash" basis for accounting purposes, so the books and tax returns reflect the actual dollars paid and received as of the close of a tax period. Therefore, the books and tax returns will not reflect transactions that were pending, had been reversed/returned before being final, had not been collected (paid out), or that were the liability of the retailers. Regarding your specifics, the $1.5MM in net sales on the SS is the $1.5MM in uncollected presales in QuickBooks. Because no proceeds from merchant accounts were paid out and Vimala had not received a 1099 reporting payout from Wells Fargo, the funds were therefore deemed "uncollected" and it was not reported as income received on the 2017 tax return.</span>

<span style="color:red">Who made the actual journal entries will be on the audit log. The 3 journal entries were made in preparation for taxes as Vimala's CPA firm (the Vaden Group) closed out the books for 2017. Since the merchant account proceeds had not been received as of the end of 2017, journal entries were made to account for what the merchant statements reflected in each account.</span>

3. 10/10 email, follow-up ("Plaintiffs' forensic consultants") to 9/27 B-4, Ms. Hestin's answer was:

"We don't have any further insight or knowledge into any other professionals (besides Mr. Lanterman) and we would have to defer to Plaintiffs' counsel to respond."

My follow-up:

a. Who are the other forensic experts that examined Plaintiffs' data and devices related to this matter, other than Mr. Lanterman?

<span style="color:red">Mr. Lanterman and his staff would be the only forensic experts to examine Plaintiffs' data and devices. Any specific questions about those examinations should be directed towards Mr. Lanterman when he is interviewed.</span>

> b. What documents/etc exist that have any details of their work, including the "two professionals at 360 Security (who) were also retained as experts for the plaintiff" as referenced in Mr. Lanterman's depo 23:4-25.

<span style="color:red">The other two experts are Mike Olson and Dan Murphy and while they are employed at 360 Security and have been retained by the Plaintiff, they are not forensic experts. Their expertise lies in the fields of banking and security.</span>

4. 9/27 email, item B-4 ("copy of My Sql database"), Ms. Hestin's answer was:

   "Plaintiffs' forensic consultants extensively reviewed the NAS and were unable to locate the database in SQL, .csv, or another format" (Also, B-7 response "Plaintiffs remain in possession of the NAS")

   My follow-up:
   a) Who performed the "extensive review" of the NAS?

   b) What tools, methods, and criteria were used to perform that review?

   c) Was there a forensic (or other) preservation of the NAS prior to that review, or was the NAS examined in a live and unpreserved state?

<span style="color:red">Because of the technical nature of these questions, I am hesitant to filter a response from Mr. Lanterman through myself. I think this is a question that should be directed to Mr. Lanterman during his interview.</span>

5. 9/27 email, item B-9 ("copy of her laptop"), Ms. Hestin's answer was:

   "Ms. Venkataraman testified that she searched it for responsive information"

   My follow-up:
   a) Was Ms. Venkataraman the only person who searched the laptop for responsive information?

   b) What tools, methods, and criteria were used to perform that search?

   c) Was there a forensic (or other) preservation of the laptop prior to that search, or was the laptop examined in a live and unpreserved state?

<span style="color:red">Ms. Venkataraman searched her laptop but as to the specifics, Ms. Venkataraman is more equipped to answer these questions directly during her interview.</span>

6. 9/27 email, item B-6 ("copy of the QuickBooks system"), Ms. Hestin's answer was"

   "Plaintiffs will provide (temporary access to Vimala's QuickBooks system) via separate communication"

My follow-up:

> Our objective was to examine the QB system, and export some of the data. The access that I was granted was limited, and prevented me from being able to complete my work.
>
> a) Please provide more complete access so I can complete my examination and exports.
>
> b) What roles did each of the following 4 "people" have in accessing the QB system in 2016 and 2017: i) Samantha Rohling (2016: 10/6-10/11), ii) Brooke (2017: 1/30-3/13), iii) Anita Rogers (2017: 8/3-8/18), iv) Vaden Group (2017: 8/17-12/6)?
>
> c) In 2016 and 2017, besides Ms. Venkataraman, were they the only users of QB? If not, who were the others?
>
> d) Were the date ranges listed above the only dates that the listed users accessed QB?

Administrative access to QuickBooks has already been provided. The only higher access available is Ms. Venkataraman's which was not provided during discovery.
The audit log in QBs will show all activity and users since the account was opened.
Samantha Rohling was the CPA at the Vaden Group, who did Vimala's taxes and accounting. Anita Rogers was a bookkeeper that worked for Vimala directly for a very short time. The Vaden Group was Vimala's CPA firm.

Sincerely,

Zachery S. Darnell, Esq.
Licensed in TN and FL
Zachery@B-M.law



Barham & Maucere LLC
6708 Heritage Business CT
Chattanooga, TN 37421
O +1 423.855.1755
Ext: 1003
Toll Free: 833.77BMLAW

PRIVATE AND CONFIDENTIAL

This e-mail message contains privileged and confidential information intended only for the use of the intended recipient(s). Any review, use, disclosure or distribution by persons or entities other than the intended recipient(s) is prohibited. If you are not an intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message and attachment(s). Unless an express agreement has been reached between you and Barham & Maucere LLC regarding the specific terms of engagement, no attorney/client relationship is created by virtue of this message, its contents, or any enclosures, and you may not rely upon this message for any purpose, including for the purpose

of obtaining legal advice. Barham & Maucere LLC disclaims liability for losses or damage resulting from viruses or other defects in connection with this e-mail. PUSHTOSTART is a product of Barham & Maucere LLC

CONSUMER NOTICE PURSUANT TO 15 U.S.C. SECTION 1692(G). Barham & Maucere LLC is a debt collector. This is an attempt to collect a debt and any information obtained will be used for that purpose. This letter is from a debt collector. Unless you notify this office within thirty days after the receipt of this notice that you dispute the validity of this debt or any portion thereof, this office will assume this debt is valid. If you notify this office in writing within the thirty-day period that the debt or any portion thereof is disputed, this office will obtain verification of the debt or obtain a copy of a judgment against you, and a copy of such verification or judgment will be mailed to you. Upon your written request within the thirty-day period, this office will provide you with the name and address of the original creditor, if different from the current creditor.

---

**From:** scott <scott@pegasussquire.com>
**Sent:** Monday, October 24, 2022 8:03 PM
**To:** Zachery Darnell <zachery@b-m.law>; Hestin, Nellie E. <NHestin@mcguirewoods.com>; Daniel Barham <dan@b-m.law>
**Cc:** pSmalto <psmalto@pegasussquire.com>; Shaw, Jarrod D. <JShaw@mcguirewoods.com>
**Subject:** pSmalto - status for responses expected today 10/24

Hello Mr. Barham, Mr. Darnell, and Ms. Hestin,

I am checking in on the status for getting the responses scheduled for today (10/24) from:

- my 10/14 email re follow-up questions, and
- Mr. Barham's 10/19 email re invoice payments

Thank you.

With best regards,

-scott.

---

**From:** scott
**Sent:** Monday, October 17, 2022 12:05 PM
**To:** 'Zachery Darnell' <zachery@b-m.law>; Hestin, Nellie E. <NHestin@mcguirewoods.com>
**Cc:** pSmalto <psmalto@pegasussquire.com>; Shaw, Jarrod D. <JShaw@mcguirewoods.com>; Daniel Barham <dan@b-m.law>
**Subject:** RE: pSmalto - documents, data, and testimony - follow-up questions

Mr. Darnell,

Thank you.

As an FYI, I didn't know who had the best info for the answers, so was not intentionally directing the

questions to Plaintiffs; however, if it turns out that Plaintiffs have the best access to the requested info, then I'll look forward to Plaintiffs' responses.

Thanks again.

With best regards,

-scott.

---

**From:** Zachery Darnell <zachery@b-m.law>
**Sent:** Monday, October 17, 2022 11:58 AM
**To:** scott <scott@pegasussquire.com>; Hestin, Nellie E. <NHestin@mcguirewoods.com>
**Cc:** pSmalto <psmalto@pegasussquire.com>; Shaw, Jarrod D. <JShaw@mcguirewoods.com>; Daniel Barham <dan@b-m.law>
**Subject:** RE: pSmalto - documents, data, and testimony - follow-up questions

Mr. Cooper,

Thank you for this email. It appears that each of these questions are directed at the Plaintiffs. I am working on responding to each inquiry and will provide a response once I have collected all of the information requested. Please let me know if you need anything else. Thank you.

Sincerely,

Zachery S. Darnell, Esq.

---

**From:** scott <scott@pegasussquire.com>
**Sent:** Friday, October 14, 2022 5:08 PM
**To:** Zachery Darnell <zachery@b-m.law>; Hestin, Nellie E. <NHestin@mcguirewoods.com>
**Cc:** pSmalto <psmalto@pegasussquire.com>; Shaw, Jarrod D. <JShaw@mcguirewoods.com>; Daniel Barham <dan@b-m.law>
**Subject:** pSmalto - documents, data, and testimony - follow-up questions

Hello Mr. Darnell and Ms. Hestin,

Thank you for your much-appreciated efforts in responding to my questions / requests for clarification.

As I just emailed, as we've been working through your responses prior to today, we have six sets of follow-up questions to finalize the related clarifications:

From my:

1. 9/27 email, item A-3 ("who generated"), Mr. Darnell's answer was:

"All of this **data came from** the e-commerce/campaign backend (i.e. Shopify). Ms. Venkataraman said that it is her memory that these were exports used to reconcile accounts at the end of a campaign. The data for each campaign **would be exported** from the e-commerce system and/or backend system in use for that campaign (Shopify, Woocommerce, etc). It was as simple as selecting a report type, a date range, and clicking **export which would generate a csv file**. That file would be opened, and the data would be added as a tab to the master excel sheet for each account. The data was updated each time a campaign was closed, so the file was continually updated over many months with multiple people involved."

My follow-up:
> After our preliminary exam of the QuickBooks ("QB") access that we were provided, it appears that the data is not contained within QB. You reference "the e-commerce/campaign backend (i.e. Shopify)".
>
> Specifically (not "i.e."):
> a. Where (i.e. what system/data source) did the 3 spreadsheets ("SS") come from?
> b. Where are those systems/data sources now?
> c. Who generated the exports/.CSV files?
> d. Where are (and please provide) the original .CSV files?

2. 9/27 email, item A-4 ("sales tax returns"), Mr. Darnell's answer was:

"Vimala was a service provider, so Vimala's services were not taxable, and it was not required to collect or remit sales tax for the services provided. Vimala only had Nexus in Tennessee, so it filed $0 sales tax returns in TN. . . . We have included Ms. Venkataraman's and Vimala, LLC's federal tax returns along with the state sales tax documents in order to provide additional context."

My follow-up:
> After our preliminary exam of the recently provided tax documents: From the previously provided 3 SS, the January 2017 campaign of ICSP has <u>approximately</u>: 400 transactions, for 800 units, at $55, for a $50k gross sales, with $11k of returns, (thus $39k of net sales), $2k of sales taxes, for a total net of $41k.
>
> a) Can Ms. Venkataraman (or if not her, then can someone else) explain the discrepancy between "no sales tax returns" versus the reported $2k of sales taxes charged as related to just the 1/'17 ICSP campaign?
>
> The tax returns and QB data show gross revenues in 2016 of $0 and in 2017 of $121k. The 3 SS show 2017 transactions totaling <u>approximately</u>: $1.6mm gross sales, $100k returns, $1.5mm net sales, and $33k of taxes.
>
> For 2017 transactions, QB shows:
> - "2017 Uncollected Pre-Sales" of just 3 journal entries ($801k, $429k, and $314k =

- $1.5mm), all made on 12/31/2017 (presumably made by Michael Vaden, of the Vaden Group, during his QB access of 1/20/2018 854am-922am, and not during his most recent prior access of 12/6/2017 at 900am)
- "Other Income" of $121k from the Skyway Studios Settlement
- "Sales" of only $209 from 4 Stripe transfers in December (11 ($23), 26 ($61), 27 ($39), and 28 ($86))
- No entries for any product returns or sales taxes.

    b) Can Ms. Venkataraman (or if not her, then can someone else):
       i) explain the discrepancy between the noted QB and SS income/etc. data versus the filed/provided tax returns?
       ii) confirm that it was the Vaden Group that made those 3 journal entries, or if not, then who?

3. 10/10 email, follow-up ("Plaintiffs' forensic consultants") to 9/27 B-4, Ms. Hestin's answer was:

"We don't have any further insight or knowledge into any other professionals (besides Mr. Lanterman) and we would have to defer to Plaintiffs' counsel to respond."

My follow-up:

    a. Who are the other forensic experts that examined Plaintiffs' data and devices related to this matter, other than Mr. Lanterman?

    b. What documents/etc exist that have any details of their work, including the "two professionals at 360 Security (who) were also retained as experts for the plaintiff" as referenced in Mr. Lanterman's depo 23:4-25.

4. 9/27 email, item B-4 ("copy of My Sql database"), Ms. Hestin's answer was:

"Plaintiffs' forensic consultants extensively reviewed the NAS and were unable to locate the database in SQL, .csv, or another format" (Also, B-7 response "Plaintiffs remain in possession of the NAS")

My follow-up:
    a) Who performed the "extensive review" of the NAS?

    b) What tools, methods, and criteria were used to perform that review?

    c) Was there a forensic (or other) preservation of the NAS prior to that review, or was the NAS examined in a live and unpreserved state?

5. 9/27 email, item B-9 ("copy of her laptop"), Ms. Hestin's answer was:

"Ms. Venkataraman testified that she searched it for responsive information"

My follow-up:
> a) Was Ms. Venkataraman the only person who searched the laptop for responsive information?
>
> b) What tools, methods, and criteria were used to perform that search?
>
> c) Was there a forensic (or other) preservation of the laptop prior to that search, or was the laptop examined in a live and unpreserved state?

6. 9/27 email, item B-6 ("copy of the QuickBooks system"), Ms. Hestin's answer was"

"Plaintiffs will provide (temporary access to Vimala's QuickBooks system) via separate communication"

My follow-up:
> Our objective was to examine the QB system, and export some of the data. The access that I was granted was limited, and prevented me from being able to complete my work.
>
> a) Please provide more complete access so I can complete my examination and exports.
>
> b) What roles did each of the following 4 "people" have in accessing the QB system in 2016 and 2017: i) Samantha Rohling (2016: 10/6-10/11),  ii) Brooke (2017: 1/30-3/13),  iii) Anita Rogers (2017: 8/3-8/18),  iv) Vaden Group (2017: 8/17-12/6)?
>
> c) In 2016 and 2017, besides Ms. Venkataraman, were they the only users of QB? If not, who were the others?
>
> d) Were the date ranges listed above the only dates that the listed users accessed QB?

--- --- ---

Mr. Darnell and Ms. Hestin, although I referenced who I received each answer from above, my above follow-up items request the related answers from whoever has the best access to the requested info. Since today (10/14) is the last day that our prior schedule used for our agreed-upon 9/27 requested (A) and (B) items, is 10 days from today (10/24) a reasonable time to allow you to answer these follow-ups?

Thank you.


With best regards,

-scott.